18-474-cv
*Citizens for Responsibility and Ethics in Washington, et al. v. Donald J. Trump*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of August, two thousand twenty.

PRESENT:

ROBERT A. KATZMANN,
*Chief Judge*,
JOSÉ A. CABRANES,
ROSEMARY S. POOLER,
PETER W. HALL,
DEBRA ANN LIVINGSTON,
DENNY CHIN,
RAYMOND J. LOHIER, JR.,
SUSAN L. CARNEY,
RICHARD J. SULLIVAN,
JOSEPH F. BIANCO,
WILLIAM J. NARDINI,
STEVEN J. MENASHI,
*Circuit Judges*.

---

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, RESTAURANT OPPORTUNITIES CENTERS UNITED, INC., JILL PHANEUF, ERIC GOODE,

*Plaintiffs-Appellants*,

v.                                          No. 18-474-cv

DONALD J. TRUMP, IN HIS OFFICIAL

1

CAPACITY AS PRESIDENT OF THE UNITED
STATES OF AMERICA,

*Defendant-Appellee.*

---

For Plaintiffs-Appellants: DEEPAK GUPTA (Jonathan E. Taylor, Joshua Matz, and Daniel Townsend, *on the brief*), Gupta Wessler PLLC, Washington, D.C.

Joseph M. Sellers, Daniel A. Small, Cohen Milstein Sellers & Toll PLLC, Washington, D.C.

Norman L. Eisen, Stuart C. McPhail, Adam J. Rappaport, Citizens for Responsibility and Ethics in Washington, Washington, D.C.

Laurence H. Tribe, Harvard Law School, Cambridge, MA.

For Defendant-Appellee: HASHIM M. MOOPPAN (Chad A. Readler, Michael S. Raab, Megan Barbero, *on the brief*; Joseph H. Hunt, Mark R. Freeman, Michael S. Raab, Martin Totaro, Joshua Revesz, *on the petition*), Department of Justice, Washington, D.C.

Following disposition of this appeal on September 13, 2019, a judge of the Court requested a poll on whether to rehear the case *en banc*. A poll having been conducted and there being no majority favoring *en banc* review, rehearing *en banc* is hereby **DENIED**.

José A. Cabranes, *Circuit Judge*, dissents by opinion from the denial of rehearing *en banc*.

Steven J. Menashi, *Circuit Judge*, joined by Debra Ann Livingston and Richard J. Sullivan, *Circuit Judge*s, dissents by opinion from the denial of rehearing *en banc*.

John M. Walker, Jr., *Circuit Judge*, filed a statement with respect to the denial of rehearing *en banc*.

Pierre N. Leval, *Circuit Judge*, filed a statement with respect to the denial of rehearing *en banc*.

Michael H. Park, *Circuit Judge*, took no part in the consideration or decision of this petition.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

José A. Cabranes, *Circuit Judge*, dissenting from the order denying rehearing en banc:

I respectfully dissent from the order denying rehearing of this case en banc.[1]

We have missed an opportunity to address en banc a "question of exceptional importance," Fed. R. App. P. 35(a)(2), regarding the limits of the judicial power under Article III of the Constitution in addressing a constitutional claim against a President. The exceptional importance of the case is beyond dispute and its portentousness, which made rehearing en banc appropriate, is effectively captured in Judge Walker's "Statement" in response to the order denying rehearing en banc and Judge Menashi's comprehensive discussion of the principles of Article III standing.

As Justice Robert H. Jackson aptly reminded us, "because our own jurisdiction is cast in terms of 'case or controversy,' we cannot accept as the basis for review, nor as the basis for conclusive disposition of an issue of federal law without review, any procedure which does not constitute [a true case or controversy]." *Doremus v. Bd. of Ed. of Borough of Hawthorne*, 342 U.S. 429, 434 (1952); *see also Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 135 (2011) (noting that Justice Jackson's opinion in *Doremus* "reiterated the foundational role that Article III standing plays in our separation of powers"). We are not authorized to review a constitutional violation unless there is an adequate showing that the party bringing the lawsuit is in fact sustaining or "is immediately in danger of sustaining some direct injury," such as a "direct dollars-and-cents injury," as a result of

---

[1]     I have not solicited concurrences for my opinion.

the challenged unconstitutional conduct by the President. *Doremus*, 342 U.S. at 434 (internal quotation marks omitted) (quoting *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923)).

It is worth underscoring that only the threshold question of plaintiffs' constitutional standing at the pleading stage has been resolved by our Court. We are far from the finish line—the resolution of the merits of the plaintiffs' claims lies before us. On remand, the District Court will need to determine whether the operative complaint in this case states a claim upon which relief can be granted. In conducting this inquiry, the District Court likely will need to address various issues that have yet to be resolved by the Court of Appeals, including whether: (1) the Foreign and Domestic Emoluments Clauses in the Constitution create a privately enforceable right of action against the President; and (2) the plaintiffs' asserted interests fall within the zone of interests protected by the Emoluments Clauses. In carefully addressing these threshold issues on remand, at the motion-to-dismiss stage, the District Court will be able to determine in the first instance whether the case should be dismissed on the merits pursuant to Federal Rule of Civil Procedure 12(b)(6).

MENASHI, *Circuit Judge*, joined by LIVINGSTON and SULLIVAN, *Circuit Judges*, dissenting from the denial of rehearing *en banc*:

The owner of several New York-based hotels and restaurants, along with an association of restaurants and restaurant workers, sued the President of the United States alleging violations of the Emoluments Clauses of the Constitution. These restauranteurs seek a judicial declaration that the President is acting unconstitutionally and an injunction restraining him from doing so. To invoke the judicial power against any defendant, a plaintiff must establish standing to sue—meaning that there is a concrete case or controversy between the plaintiff and the defendant. "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). The standing requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). For that reason, when a plaintiff asks a court "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the standing inquiry must be "especially rigorous." *Id.* Yet the majority opinion not only relaxes the ordinary rules of standing; it abandons those rules altogether. Accordingly, I dissent from the denial of rehearing *en banc*.

To establish standing, a plaintiff must show that he or she suffered an injury traceable to the defendant's conduct that the court could redress. Here, the restauranteurs argue that the President's continued interest in the Trump Organization gives Trump-affiliated businesses an advantage in attracting customers who work for foreign or state governments—because those customers think that eating at a Trump-affiliated restaurant or staying at a Trump-

affiliated hotel will enrich the President and thereby curry favor with him.

Are there plausible allegations of this? The majority opinion believes so; it cites a press report about foreign diplomats planning to patronize the Trump International Hotel in Washington D.C.[1] The majority also relies on the allegation, based on another press report, that the Embassy of Kuwait moved an event to the Trump International from the Four Seasons after the President was elected.[2] But the Four Seasons Hotel is not suing the President. In fact, no owner of any hotel in Washington D.C. is a plaintiff in this case, and the plaintiffs here cannot sue on behalf of parties not before the court. "Injured parties 'usually will be the best proponents of their own rights,'" and if "'the holders of those rights do not wish to assert them,' third parties are not normally entitled to step into their shoes." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479 (2006) (internal citation and alteration omitted).

So why does the majority opinion discuss injuries to Washington-based hotels that are not plaintiffs in this case? Because the actual plaintiffs have no evidence of their own injury. They have only a *theory* of injury, which goes like this: Officials from foreign and state governments would normally eat at (for example) Amali, a Mediterranean restaurant on the Upper East Side of Manhattan that is affiliated with one of the plaintiffs. But because those officials want

---

[1] *Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 186 (2d Cir. 2019), *as amended* (Mar. 20, 2020) (citing Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place To Be*, WASH. POST (Nov. 18, 2016)).

[2] *Id.* at 187 (citing Second Am. Compl. ("Compl.") ¶ 74).

to curry favor with the President by enriching him with emoluments, they instead eat at (for example) Jean-Georges, a French restaurant located at the Trump International Hotel on the Upper West Side.[3] Does President Trump even own Jean-Georges? The complaint does not allege that he does. No matter. The complaint alleges that the business from foreign and state government officials dining at restaurants on Trump properties is so extensive that it "affects the amount of rent that [the President] is able to charge," thereby enriching the President.[4]

Is it really the case that foreign and state government officials are abandoning the plaintiffs' establishments in favor of restaurants located at Trump properties in the hopes of enhancing the President's rental income? It's *possible*, though one might justifiably be skeptical. But if the jurisdiction of the court hinges on the answer to that question, one might think the court would require the plaintiffs to identify some evidence that at least one official has actually chosen a Trump-located restaurant over one of the plaintiffs' restaurants for an emoluments-based reason. But the plaintiffs have no such evidence, and the majority opinion does not think it is necessary. Instead, the majority opinion finds the plaintiffs' theory of injury so clearly compelling as a matter of "economic logic" that the court can dispense with the normal requirement that standing be based on a concrete injury rather than a speculative one.

---

[3] Compl. ¶ 196 ("Trump International Hotel & Tower New York includes restaurants Jean-George[s] and Nougatine."); Mallios Decl. ¶ 4 (declaration of owner of Amali that his restaurant competes with Jean-Georges, among other restaurants); *see also CREW*, 953 F.3d at 186 (relying on the Mallios Declaration).

[4] Compl. ¶ 109.

No precept of logic or economics holds that foreign and state government officials will necessarily alter their dining preferences at high-end Manhattan restaurants out of a single-minded desire to give the President additional leverage in lease negotiations with restaurants he does not own. It's possible, perhaps, that this has happened or will happen. But to establish standing, a plaintiff must demonstrate an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). If the injury is not certain or "certainly impending" but merely "possible," the requirements of Article III are not met. *Clapper*, 568 U.S. at 409 (emphasis omitted). The "[r]elaxation of standing requirements is directly related to the expansion of judicial power" beyond review of cases and controversies toward evaluating government actions that the plaintiffs happen to oppose. *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring). Because that expansion of judicial power is inconsistent with Article III—and for other reasons discussed below—I dissent from the denial of rehearing *en banc*.

## A. Competitor Standing

Rehearing is needed, first and foremost, to "secure or maintain uniformity of the court's decisions" on the competitor-standing doctrine. Fed. R. App. P. 35(a)(1). This court has spoken inconsistently about the showing a competitor must make to establish that its injury is "actual or imminent" and "fairly traceable" to the defendant's conduct rather than conjectural or hypothetical. *Clapper*, 568 U.S. at 409. This court has said, for example, that "in order to establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit" but at the same time the

court was concerned that by merely "asserting that an advantage to one competitor adversely handicaps the others, plaintiffs have not pleaded that they were personally" harmed. *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029-30 (2d Cir. 1989) (worrying that "a competitor advocate theory of standing" would "lack a limiting principle, and would effectively give standing to any spectator who supported a given side in public political debate").[5] In subsequent cases on competitor standing, this court adopted the first part of the *Catholic Conference* formulation without expressing the same concern that a plaintiff ought to show personal harm beyond mere advantage to a competitor. "In order to 'satisfy the rule that he was personally disadvantaged,'" the court said, "a plaintiff must 'show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit.'" *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002) (concluding that it was enough to establish standing that "an advocacy organization … competes with … groups engaged in advocacy around the very same issues" and the government "bestowed a benefit on plaintiffs' competitive adversaries").

---

[5] In *Catholic Conference*, the court concluded that the plaintiffs were not electioneering competitors with the Catholic Church, 885 F.2d at 1029, but also concluded that they lacked standing as competitors in public advocacy because of a lack of a concrete injury, *see id.* at 1030 ("It may be argued that to qualify as competitor advocates plaintiffs need not go so far as to run for office or lobby; rather, they may simply advocate the pro-choice cause and stop short of supporting candidates. But that argument fails to answer the nagging question of why these individuals and organizations are then the appropriate parties to call a halt to the alleged wrongdoing. It is obvious that plaintiffs express their pro-choice views strongly and articulately. Yet such strongly held beliefs are not a substitute for injury in fact.").

The majority opinion in this case repeats the relaxed standard without the concern for establishing personal harm: "To make an adequate allegation of a competitive injury, plaintiffs must plausibly allege (1) that an illegal act bestows upon their competitors 'some competitive advantage,' and (2) 'that they personally compete in the same arena' as the unlawfully benefited competitor." *CREW*, 953 F.3d at 190 (internal citation omitted). This idea—that a plaintiff may establish standing by showing an advantage to a competitor without needing to show any personal harm to oneself—finds some support in previous Second Circuit case law. But it is irreconcilable with the Supreme Court's instruction that an injury must be "concrete," "particularized," and "certainly impending." *Clapper*, 568 U.S. at 409.[6]

Perhaps recognizing that Supreme Court precedent requires a more concrete showing, the majority opinion cites cases from other circuits to support its assertion that personal harm exists here as a matter of "economic logic." 953 F.3d at 190 (citing cases from the Fifth,

---

[6] This court already took a questionable turn when it applied case law applicable to economic competitors to the political arena with "a theory that this Court has dubbed 'competitive advocate standing.'" *Bush*, 304 F.3d at 197 ("We have acknowledged the possibility that a plaintiff may have standing to bring an equal protection claim where the government's allocation of a particular benefit 'creates an uneven playing field' for organizations advocating their views in the public arena."); *Catholic Conference*, 885 F.2d at 1030 ("Although the foregoing cases conferred standing to economic competitors, political competitors arguably should fare as well."). The majority opinion now applies this watered-down theory of standing from the political context back to economic competitors. But as the Supreme Court has recently explained, standing must be "based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013).

D.C., and Federal Circuits). But no other circuit assumes, as the majority opinion does, that "economic logic" dictates a finding of personal harm whenever a competitor has an advantage. Even the cases on which the majority opinion relies demonstrate that other courts require a greater showing than the relaxed standard. In *KERM, Inc. v. FCC*, 353 F.3d 57 (D.C. Cir. 2004), the court said that "[w]hile a party that is 'likely to be financially injured' by a Commission decision may have competitor standing to challenge Commission actions under the Act, *that party must make a concrete showing that it is in fact likely to suffer financial injury as a result of the challenged action.*" *Id.* at 60-61 (internal citations omitted and emphasis added). The D.C. Circuit specifically said it was not enough for a plaintiff to rely only on allegations that government action had provided a competitor with a competitive advantage:

> KERM might have satisfied the requirements of competitor standing if it had introduced evidence that KAYH's broadcast of the disputed announcements resulted in lost advertising revenues for KERM or otherwise adversely affected KERM's financial interests. KERM offered no such evidence. Rather, KERM vaguely asserts only that it competes with KAYH and that its own radio stations serve much of the same audience as KAYH. Such "[b]are allegations are insufficient ... to establish a petitioner's standing to seek judicial review of administrative action."

*Id.* at 61 (relied on in *CREW*, 953 F.3d at 190).

*KERM* followed prior D.C. Circuit precedent that declined to apply the competitor-standing doctrine where the plaintiffs' causal chain "depends on the independent actions of third parties," as "distinguish[ed] … from the garden variety competitor standing

7

cases which require a court to simply acknowledge a chain of causation firmly rooted in the basic law of economics." *New World Radio v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (internal quotation marks omitted).

The majority opinion also relies on *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319 (Fed. Cir. 2008). In that case, the Federal Circuit explained that a plaintiff could properly "invoke the doctrine of 'competitor standing,' which relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors," only after the court below had "conducted a two-day evidentiary hearing devoted to the question of injury-in-fact" that involved "expert testimony … concerning the types of economic injury that were likely to result from government subsidization of a competitor." *Id.* at 1332-33 (relied on in *CREW*, 953 F.3d at 190).

These cases do not say that a plaintiff is personally harmed as a matter of economic logic whenever that plaintiff's competitor in the same market receives a benefit. Rather, the cases say that when a competitor receives a benefit, the plaintiff *may* be able to show that personal harm follows as a matter of economic logic. But the plaintiff must make that showing. The court should not simply assume that economic logic compels a finding of personal harm every time a plaintiff and defendant are competitors in the same market.

Thus, the majority opinion relies on Second Circuit precedent to hold that a plaintiff need only meet the relaxed standard to establish competitor standing, and then it relies on non-circuit precedent to hold that once competitor standing has been established,

a concrete injury traceable to the defendant has necessarily been demonstrated as a matter of economic logic. But these two lines of cases are incompatible. The "economic logic" cases require the plaintiff to demonstrate that it will "likely" or "almost surely"[7] suffer personal harm as a result of the challenged actions, while the relaxed standard takes personal harm for granted.

The majority opinion in this case did not require a showing that the competition "almost surely" caused the alleged injury. Rather, the majority thought it was enough for the alleged competitive injury to consist of "revenue that *might* otherwise have gone to Plaintiffs" and may be one among several "other possible, or even likely, causes for the benefit going to the plaintiff's competition." *CREW*, 953 F.3d at 191, 192 (emphasis added). There is simply no way to reconcile the standard the majority applied here with the Supreme Court's holding that an injury must be "certainly impending" rather than merely "possible." *Clapper*, 568 U.S. at 409.[8]

---

[7] *See El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27-28 (D.C. Cir. 1995) ("The nub of the 'competitive standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will *almost surely* cause petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing. … [In the absence of such certainty, a plaintiff is] required to allege facts demonstrating 'injury in fact.'") (emphasis added).

[8] *See also In re Trump*, 958 F.3d 274, 327 (4th Cir. 2020) (*en banc*) (Niemeyer, J., dissenting) (criticizing the majority opinion in *CREW* because "rather than analyzing how the New York properties' distribution of income to the President gives those properties a competitive advantage over their competitors, the Second Circuit simply reiterated the causation standard at a highly general level and stated that there was 'a substantial likelihood that [the plaintiffs'] injury [was] the consequence of the challenged conduct'" and because it "failed to explain … how a President's direct receipt of

As noted, standing must be "based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." *Already*, 568 U.S. at 99; *see also In re Trump*, 958 F.3d at 294 (Wilkinson, J., dissenting) ("Generally speaking, freestanding 'competitive injuries' do not constitute legal wrongs traditionally redressable by the courts."). But that is precisely the showing the majority opinion held to be sufficient in this case. And the facts of this case show why such a theoretical "injury" is insufficient—because it is not at all clear that foreign and state government officials are choosing to eat at Jean-Georges rather than Amali, or to stay at the Trump SoHo New York rather than the Maritime Hotel in Chelsea,[9] because these officials want to enrich the President.[10] The plaintiffs have not identified even a single instance of that occurring. As the district court sensibly noted, "it is wholly speculative whether the Hospitality Plaintiffs' loss of business is fairly traceable to Defendant's 'incentives' [i.e. 'patroniz[ing] his properties in hopes of winning his affection'] or instead results from government officials' independent desire to

income from a hotel investment—as opposed to, for example, his family members' receipt of that income—could have skewed the market in his favor").

[9] Compl. ¶ 228.

[10] *See In re Trump*, 958 F.3d at 326 (Niemeyer, J., dissenting) (noting that the "theory of proprietary harm hinges on the conclusion that government customers are patronizing the Hotel *because the Hotel distributes profits or dividends to the President*, rather than due to a more general interest in currying favor with the President or because of the Hotel's branding or other characteristics. Such a conclusion, however, is not only economically illogical, but it also requires speculation into the subjective motives of independent actors who are not before the court, thus precluding a finding of causation").

10

patronize Defendant's businesses." *Citizens for Responsibility & Ethics in Wash. v. Trump*, 276 F. Supp. 3d 174, 186 (S.D.N.Y. 2017).[11]

Markets vary in terms of whether increased competition will yield harm. In a single-transaction market with 1000 buyers and two sellers, we might expect an unfairly advantaged seller to take some business from its competitor. But in a market with one buyer and 1000 sellers, we know for sure that even if a seller has been unfairly advantaged, at least 998 of the other sellers have not suffered an injury because the buyer was not choosing them anyway. Is the market for serving meals to foreign and state government officials more like the first example or the second? The majority opinion is not even interested in the question because it simply assumes that whenever businesses compete over the "same customer base," an advantage for one is an injury to all the others. *CREW*, 953 F.3d at 190. That is indefensible.[12] "[F]or a federal court to have authority under the

---

[11] "Standing … is not an ingenious academic exercise in the conceivable but requires a factual showing of perceptible harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (internal quotation marks and alterations omitted). In the context of associational standing, the Supreme Court has rejected "probabilistic standing" and "required plaintiffs … to identify members who have suffered the requisite harm," even when it was accepted that such a person "likely" exists. *Id.*

[12] In his statement respecting the denial of rehearing *en banc*, Judge Leval asserts that this dissent "posits" that the market for high-end restaurants and hotels is one with many sellers and few buyers. As you can see, this dissent posits no such thing. Rather, it points out that the majority opinion did not even consider the question, impermissibly assuming—regardless of any concrete showing about market features—that a benefit to one competitor injures all the others. Judge Leval now insists that "there are nearly 200 nations in the world (and 50 states), many of which send delegates to Washington or New York." But the majority opinion cited no evidence that representatives of any government—let alone "many of"

Constitution to settle a dispute, the party before it must seek a remedy for a personal and tangible harm." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).

I would grant the petition for rehearing *en banc* and hold that standing requires a showing of personal harm rather than mere advantage to a competitor.

## B. Injunctive Relief Against the President

Rehearing is warranted also to address whether and when injunctive relief may be granted directly against the President. The majority opinion concludes that the plaintiffs' claims are redressable because the district court could fashion various types of injunctive relief against the President, *see CREW*, 953 F.3d at 199 n.12, but the opinion never even acknowledges the disputed antecedent question of the extent to which a court may issue injunctive relief against the President. This is "a question of exceptional importance" that deserves express consideration. Fed. R. App. P. 35(a)(2).

The majority opinion holds that the plaintiffs have established redressability because "[i]njunctive relief could be fashioned along many different lines that would adequately reduce the incentive for government officials to patronize Trump establishments in the hope of currying favor with the President." *CREW*, 953 F.3d at 199. The

---

those 200 countries and 50 states—have patronized the plaintiffs' restaurants and have shifted their business in order to enrich the President. Judge Leval's statement supplies speculation about the potential buyers in the marketplace to take the place of the "concrete injury" that Article III requires. *Lujan*, 504 U.S. at 572. But "allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks and alteration omitted).

opinion then suggests in a footnote that the district court could (1) "bar the Trump establishments from selling services to foreign and domestic governments during the President's tenure in office"; (2) "require the President to establish a blind trust or otherwise prevent him from receiving information about government patronage of his establishments"; or (3) "require public disclosure of the President's private business dealings with government officials through the Trump establishments." *Id.* at 199 n.12.

As the case is currently structured, each of these forms of injunctive relief would run directly against the President because the President, in his official capacity, is the sole defendant. So we are talking about the district court ordering the President to direct his businesses to refuse to host diplomatic guests, to sell his assets and to place the proceeds into a blind trust, not to discuss with foreign officials where they have lodged or eaten, or to direct his hotels to announce to the public whenever a foreign or state official stays there. The majority opinion's suggestion that a district court might award such relief is so radical that the plaintiffs suing the President over emoluments in a separate case have disavowed it.[13]

Other courts have concluded that such relief is not available. For example, in a case challenging religious displays at presidential inaugurations, the D.C. Circuit concluded the plaintiffs lacked standing because any relief that could redress the alleged injury would need to take the form of an injunction against the President and "[w]ith regard to the President, courts do not have jurisdiction to

---

[13] *See* Oral Argument Audio Recording at 1:14:13 to 1:14:16, *In re Trump*, No. 18-2486 (4th Cir. Dec. 12, 2019) (counsel for plaintiffs stating "I'm not advancing what the Second Circuit had in its footnote").

enjoin him, and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (internal citation omitted). In this case, by contrast, the majority opinion does not grapple with the separation-of-powers question but simply assumes that injunctive relief is available against the President in his official capacity. To be sure, the government argued to this court that such relief is not available, Brief for Appellee 42-43, but the majority opinion did not even pause to consider the government's arguments.

The Supreme Court has long held that courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties" that are discretionary. *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). That case, as well as the plurality opinion in *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992), left open the question whether courts have jurisdiction to enjoin the President for duties that are "ministerial." Several lower courts, however, have held or suggested that courts lack jurisdiction to order injunctive relief directly against the President even for so-called ministerial acts. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 977-78 (D.C. Cir. 1996); *Lovitky v. Trump*, No. 19-1454, 2019 WL 3068344, at *10 (D.D.C. July 12, 2019) ("Notwithstanding some lingering uncertainty, the Court takes Supreme Court and recent Circuit decisions as supplying enough direction: This Court should not grant mandamus, injunctive, or declaratory relief against a sitting President to require performance of a ministerial duty."), *aff'd in part, vacated in part on other grounds*, 949 F.3d 753 (D.C. Cir. 2020).[14]

---

[14] *See also In re Trump*, 958 F.3d at 299 (Wilkinson, J., dissenting) (arguing that "compliance with the Emoluments Clauses is not a 'ministerial duty'"

Justice Scalia suggested that the proper inquiry should not be whether the duty is discretionary or ministerial but whether a court would be ordering the President "to exercise the 'executive Power' in a judicially prescribed fashion." *Franklin*, 505 U.S. at 826 (Scalia, J., concurring); *see also Swan*, 100 F.3d at 989-90 (Silberman, J., concurring). In Justice Scalia's view, telling the President how to exercise the executive power would be tantamount to telling a member of Congress to vote to pass or repeal a particular law. *Franklin*, 505 U.S. at 826 (Scalia, J., concurring).[15]

It is not immediately obvious whether the injunctions the majority opinion hypothesizes would direct the exercise of the executive power. On the one hand, owning a business is a private function; on the other hand, ordering affairs to avoid emoluments is a duty that applies to the President only because he is the President, U.S. Const. art. II, § 7, or because he may be a "Person holding an[] Office of Profit or Trust under" the United States, *id*. art. I, § 9.[16] That the plaintiffs have sued the President only in his official capacity at least suggests that the sought-after relief relates to his official powers. But even if one were confident that the injunction related to the

---

and noting that, regardless, "the federal courts have never sustained an injunction" that required the President to perform a ministerial duty).

[15] Justice Scalia's view was not limited to injunctive relief. He noted that "[f]or similar reasons, I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring).

[16] That is, assuming the Foreign Emoluments Clause applies to the President. *Compare* Amici Br. of Former National Security Officials at 13-17 (arguing the clause applies to the President), *with* Amici Br. of Seth Barrett Tillman & the Judicial Education Project at 16-25 (arguing it does not).

15

President's personal conduct, an "interbranch conflict … does not vanish simply because" legal process relates to "personal" matters "or because the President [was] sued in his personal capacity. The President is the only person who alone composes a branch of government," and therefore "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020) (quoting *The Federalist* No. 51). The court's authority to issue injunctive relief in this case presents a difficult and important question regarding the separation of powers. The majority opinion should have addressed that question instead of assuming it away.[17]

Even if injunctive relief were not available, that does not "in any way suggest[] that Presidential action is *unreviewable*. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring). For example, in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the Supreme Court found presidential action unconstitutional but then approved injunctive relief only against the Secretary of

---

[17] The Fourth Circuit's *en banc* majority opinion concluded that such relief could be issued against the President because the Emoluments Clauses impose a restraint on his behavior rather than an affirmative duty to execute the law and because complying with the Clauses is a ministerial function. *In re Trump*, 958 F.3d at 288. There is some reason to doubt those conclusions. *See id.* at 299-300 (Wilkinson, J., dissenting); *id.* at 324 (Niemeyer, J., dissenting); *see also Swan*, 100 F.3d at 990 (Silberman, J., concurring) (noting that "whether such an order is phrased as an injunction—ordering the President not to take an allegedly illegal act—or positively—to perform a legally obliged duty—it trenches on the President's 'executive and political' duties"). But at least the Fourth Circuit, unlike this court, put forward a rationale for its decision.

Commerce. *Id.* at 584, 587-89.[18] By analogy in this case, a plaintiff who loses a government contract due to favoritism that results from illegal emoluments might be able to sue the agency or inferior executive officer who is responsible for awarding the contract in order to redress the Emoluments Clause violation. Doing so would avoid the need to consider injunctive relief against the President. This more conventional approach might also indicate who the proper plaintiff would be in a case such as this.

The question of whether and when a court can issue injunctive relief against the President is squarely raised in this case and is undoubtedly an issue of "exceptional importance." Fed. R. App. P. 35(a)(2). The majority opinion resolved it without analysis. It deserves more consideration than that.

### C. Zone of Interests

On rehearing, the panel has commendably removed the portion of its opinion addressing the zone-of-interests test on the merits. *See CREW*, 953 F.3d at 200 n.13. In doing so, the panel recognized that it was mistaken to opine on the merits of the zone-of-interests test when its only point was that the test goes not to subject matter jurisdiction but to the availability of a cause of action. The panel emphasizes that it deleted that discussion so as not to create "a precedent on the question whether the Complaint states a claim upon which relief may be granted." *Id.* In other words, the court holds only that the district

---

[18] *See also Knight First Amendment Inst. v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018) (declining to "resolve the question of whether injunctive relief may be awarded against the President" and recognizing that "courts should normally direct legal process to a lower Executive official"), *aff'd*, 928 F.3d 226 (2d Cir. 2019).

court erred in treating the zone-of-interests analysis as a reason for dismissal under Rule 12(b)(1), and the district court remains free to re-instate its zone-of-interests analysis when considering dismissal under Rule 12(b)(6).

That is a welcome change because the district court's zone-of-interests analysis was correct on the merits. The district court rightly concluded that the zone-of-interests inquiry is narrower where, as here, the suit is based on an implied cause of action under the Constitution rather than under the generous review provisions provided by the Administrative Procedure Act. *CREW*, 276 F. Supp. 3d at 187.[19] The prior majority opinion unfairly criticized that conclusion and faulted the district court for relying on Justice Scalia's dissent in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992).[20] But that passage from Justice Scalia's dissent simply described what the Supreme Court had stated in *Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987)—that "the invocation of the 'zone of interest' test" in a constitutional case "should not be taken to mean that the standing inquiry under whatever constitutional or statutory provision a

---

[19] *See also In re Trump*, 958 F.3d at 296-97 (Wilkinson, J., dissenting) ("[T]he government action complained of here is not 'agency' action subject to the 'generous' review provisions of the APA.").

[20] *See Citizens for Responsibility & Ethics in Wash. v. Trump*, 939 F.3d 131, 157 n.13 (2d Cir. 2019) ("Puzzlingly, the district court cited a passage from Justice Scalia's dissenting opinion in *Wyoming* seemingly as though it were the holding of the case."). A vestige of this unfair criticism remains in the revised opinion, *see CREW*, 953 F.3d at 188 n.6 ("The district court appeared to mistakenly rely on Justice Scalia's dissent in *Wyoming* as if it were a statement by the majority about the proper application of the zone of interests test."), though this passage in the revised opinion cross-references a portion of the opinion that has now been deleted.

plaintiff asserts is the same as it would be if the 'generous review provisions' of the APA apply." *Id.* at 400 n.16. The *Clarke* Court went on to explain that the "difference made by the APA can be readily seen by comparing the 'zone of interest' decisions" in APA cases "with cases in which a private right of action under a statute is asserted in conditions that make the APA inapplicable." *Id.* In non-APA cases, the Court "was requiring more from the would-be plaintiffs … than a showing that their interests were arguably within the zone protected or regulated" by the statute. *Id.*

The Supreme Court has since reaffirmed that proposition from *Clarke*. *See Bennett v. Spear*, 520 U.S. 154, 163 (1997) ("We have made clear … that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes.") (quoting *Clarke*, 479 U.S. at 400 n.16).

The original panel opinion erroneously concluded that the Supreme Court has rejected the distinction that Justice Scalia described.[21] As a result, the opinion treated zone-of-interests cases under the APA as applicable precedents in a case arising under the Constitution.[22] For example, it described the Supreme Court's holding

---

[21] *CREW*, 939 F.3d at 157 n.13 (concluding that, even though "[t]he majority [in *Wyoming*] did not explicitly discuss this argument," it must have "rejected Justice Scalia's contention").

[22] *Id.* at 157 ("While most cases addressing whether the plaintiff's injury is outside the zone of interests of the law alleged to be violated have concerned the zone of interests of a *statute*, and this suit alleges violations

in *Lexmark International, Inc. v. Static Control Components*, 572 U.S. 118 (2014), as extending "the longstanding view that the [zone-of-interests] test is 'not meant to be especially demanding.'" *CREW*, 939 F.3d at 154 (quoting *Clarke*, 479 U.S. at 399). But the Court has been careful to qualify this statement: "We have said, *in the APA context*, that the test is not 'especially demanding.'" *Lexmark*, 572 U.S. at 130 (emphasis added). The original panel opinion described *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1304 (2017), as "consistent with the longstanding view that a plaintiff's economic injury usually makes her a 'reliable private attorney general to litigate the issues of the public interest.'" *CREW*, 939 F.3d at 156 (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 154 (1970)). The *Bank of America* case does not mention a "private attorney general," but it does emphasize that the Court was there considering a statutory cause of action under a scheme that "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.'" *Bank of Am. Corp.*, 137 S. Ct. at 1298. We do not have such a statutory scheme in this case. Instead, we have parties relying on an implied constitutional cause of action and a grievance against the President. *But see Richardson*, 418 U.S. at 175 (noting that a party may not "employ a federal court as a forum in which to air his generalized grievances about the conduct of government").

On remand, the district court is free to reconsider the zone of interests in the context of whether the plaintiffs state a claim for relief under Rule 12(b)(6). The district court correctly followed the Supreme

---

of the *Constitution*, we can see no reason why the reasoning of the precedents reviewed above are not equally applicable here.").

Court's instruction that the zone-of-interests inquiry requires a court to consider whether the plaintiffs are within "the class for whose *especial* benefit" the provision was adopted. *Clarke*, 479 U.S. at 400 n.16.[23]

## D. Judge Leval's Statement Respecting the Denial of Rehearing

By relaxing the constitutional limits on judicial authority, the standards adopted in the majority opinion would "convert the Judiciary into an open forum for the resolution of political or ideological disputes." *Richardson*, 418 U.S. at 192 (Powell, J., concurring). The opinion "opens the door to litigation as a tool of harassment of a coordinate branch with notions of competitor standing so wide and injury-in-fact so loose that litigants can virtually haul the Presidency into court at their pleasure." *In re Trump*, 958 F.3d at 291 (Wilkinson, J., dissenting). If there were any remaining doubts about this result, one need only review the statement that Judge Leval has filed in support of the majority opinion (hereinafter "statement").

### 1. Official Acts

The statement insists that this dissent relies on a conclusion that the President's interest in hotels and restaurants is an official act. That is incorrect. This dissent argues that the majority opinion fails to apply even those standing requirements applicable to litigation between private parties, and this dissent does not reach any

---

[23] *See also In re Trump*, 958 F.3d at 297 (Wilkinson, J., dissenting) (noting that the Emoluments Clauses are "structural provisions of the Constitution designed to prevent official corruption"); *id.* at 322 (Niemeyer, J., dissenting) (noting that the Clauses "are structural provisions concerned with public corruption and undue influence").

conclusion about whether compliance with the Emoluments Clauses is an official act. It expressly declines to take a position on this difficult question, instead identifying it as an issue the majority opinion failed to address despite summarily concluding that injunctive relief was available against the President. As Part B explains, "It is not immediately obvious whether the injunctions the majority opinion hypothesizes would direct the exercise of the executive power. On the one hand, owning a business is a private function; on the other hand, ordering affairs to avoid emoluments is a duty that applies to the President only because he is the President or because he may be a 'Person holding an[] Office of Profit or Trust under' the United States" (internal citations omitted). The majority opinion should have addressed this issue and considered the propriety of injunctive relief—even if that relief affected only the President's "personal" affairs. *Mazars USA*, 140 S. Ct. at 2034.

Judge Leval now seems convinced that the majority's hypothesized remedial injunctions would run against the President only in his private capacity. Or, rather, his statement takes the position that, when it comes to the Emoluments Clauses, the President is engaging in "private conduct" while in his "official capacity." The statement's new theory says "[t]here is no inconsistency in recognizing that a President's personal receipt of moneys is private conduct, notwithstanding a complaint's naming the President in his official capacity because his office is what renders that private conduct unlawful." This state of affairs is so obvious, says the statement, that it would actually be "illogical[] [to] view[] the naming of the President 'in his official capacity' as necessarily meaning that the conduct complained of was official conduct."

22

This theory is intended to justify, retroactively, the unsupported conclusions in the majority opinion. Yet it only strengthens the case for rehearing. The Supreme Court has explained that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (internal citation omitted). But it turns out that the majority opinion, without expressly saying so, authorized an official-capacity suit that seeks remedies against the President personally. If this is what the majority was thinking, then it should have provided at least a little analysis to justify this striking departure from established practice and precedent.

It would have been unprecedented enough for the majority to claim authority—for the first time—to issue injunctive relief against the President. But now we learn that it has done so in a lawsuit the form of which has never been seen before: the official-capacity-but-private-conduct suit. The statement insists it knows of no precedent that would *preclude* such relief. But in the absence of any prior case in which this or any other "federal appellate court has allowed a claim premised on this mode of relief to move forward," the majority might have paused to explain the source of this new authority. *In re Trump*, 958 F.3d at 297 (Wilkinson, J., dissenting). "[H]istory is especially instructive when one branch of government claims a novel power against another—such as the judiciary asserting the authority to enjoin the chief executive—but cannot point to a single instance of having used it." *Id.* at 298.[24]

---

[24] Even suits involving a President's' purely private conduct—that is, his engaging in private conduct in a private capacity—require special

The Supreme Court has said that a "grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows." *Franklin*, 505 U.S. at 802. But the majority opinion did not even blink before authorizing such relief. As it stands, the majority opinion provides no reasoning at all for its dramatic holding that a court could order the President to sell all his assets. There are substantial reasons for believing the statement is wrong that compliance with the Emoluments Clauses has "nothing to do with the President's exercise of his official duties."[25] But the majority opinion's neglect of this issue—the lack of any rationale at all, let alone one with which the dissenters might agree—is what justifies *en banc* rehearing in this case.[26]

---

consideration. *See Mazars*, 140 S. Ct. at 2035 ("No one can say that the controversy here is less significant to the relationship between the branches simply because it involves personal [matters]."); *Clinton v. Jones*, 520 U.S. 681, 702 (1997) (noting that "in the more than 200-year history of the Republic, only three sitting Presidents have been subjected to suits for their private actions" and that such suits must be "properly managed by the District Court" to avoid "occupy[ing] any substantial amount of [the President's] time").

[25] *See In re Trump*, 958 F.3d at 299 (Wilkinson, J., dissenting) (arguing that "[c]ompliance with the Emoluments Clauses is an official duty of the presidency—it is a legal requirement that applies to the President by virtue of the very fact he is President, binding on him only for the duration of his time in office," and "because 'the President is the executive department,' to control him, in any official capacity, is to control the executive branch itself") (quoting *Johnson*, 71 U.S. at 500).

[26] The intense debate on this issue between the nine-judge majority and six-judge dissent in the Fourth Circuit's recent *en banc* decision makes it all the more surprising that the majority here decided not to provide any analysis on the question of judicial authority to issue injunctive relief against the

It would have been especially helpful for the majority to include some analysis on this point in its opinion because Judge Leval's newfound theory contradicts the allegations in the complaint. The plaintiffs insist no fewer than three times that they are suing the President only "in his official capacity as President of the United States."[27] The complaint alleges that President Trump is "'an officer … of the United States … *acting in his official capacity or under color of legal authority*.'"[28] And it further alleges—three more times—that the President "has used his official position as President to generate business to his hotel properties and their restaurants from officials of foreign states, the United States, and/or state and local governments."[29]

It was obviously important to the plaintiffs that they were challenging acts taken in an official capacity and that relief be sought against the President in his official capacity. That is the consistent approach among plaintiffs in every suit alleging violations of the Emoluments Clauses against the President, and the courts that have found standing in those cases have done so for claims against the President specifically in his official capacity.[30] But now we learn from

---

President. *See In re Trump*, 958 F.3d at 288-89 (nine-judge majority); *id.* at 297-302 (Wilkinson, J., dissenting, joined by five other judges).

[27] Compl. coversheet; *id.* at 1; *id.* ¶ 31.

[28] *Id.* ¶ 33 (emphasis added).

[29] *Id.* ¶¶ 202, 211, 219.

[30] *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 747 (D. Md. 2018) ("The Court is satisfied that Plaintiffs may properly bring this action against the President in his official capacity."), *aff'd sub nom. In re Trump*, 958 F.3d at 280 & n.1, 288-89; *Blumenthal v. Trump*, 373 F. Supp. 3d 191, 193 (D.D.C. 2019) ("[T]he Court held that plaintiffs … had standing to sue defendant

the statement that the majority opinion implicitly rejected the plaintiffs' allegations in their complaint and departed from every

---

Donald J. Trump in his official capacity as President of the United States."), *vacated as moot*, 949 F.3d 14 (D.C. Cir. 2020).

The statement relies on the Maryland case for the proposition that the claims under the Emoluments Clauses run against the President in his private rather than official capacity. But that reliance is misplaced. After sustaining the claims against the President in his official capacity, the district court suggested that the claims against the President in his private capacity be dismissed, and the plaintiffs voluntarily dismissed those claims. *See District of Columbia v. Trump*, 930 F.3d 209, 212 (4th Cir. 2019) (recounting this procedural history). So the plaintiffs in that case, like the plaintiffs in this one and in the D.D.C. case, have specifically decided to pursue claims against the President only in his official capacity. The Fourth Circuit's *en banc* majority concluded that the case could proceed against the President solely in his official capacity and dismissed an appeal brought by the President in his private capacity. *See In re Trump*, 958 F.3d at 280 n.1; *District of Columbia v. Trump*, 959 F.3d 126, 129 (4th Cir. 2020) (*en banc*).

The statement also asserts that the President "conceded" in the Maryland case that the claims had nothing to do with his official duties. The President there disputed the plaintiffs' definition of "emolument," arguing that it should not reach income received from businesses that had nothing to do with his official duties. Memorandum in Support of Defendant's Motion to Dismiss at 30-50, *District of Columbia v. Trump*, 315 F. Supp. 3d 875 (D. Md. 2018), ECF No. 21-1. Nowhere did the United States or the President concede that compliance with the Emoluments Clauses is private conduct. In fact, the United States argued that "Plaintiffs can state no individual-capacity claim because the Emoluments Clauses do not even apply to the President in his individual capacity." Statement of Interest of the United States at 4, *Trump*, 315 F. Supp. 3d 875, ECF No. 100. The President said that "the Court's suggestion that this dispute has 'nothing' to do with the Defendant's 'performance of his duties as president' was mistaken." Memorandum in Support of Motion to Dismiss on Behalf of Defendant in His Individual Capacity at 14-15, *Trump*, 315 F. Supp. 3d 875, ECF No. 112-1.

26

other court to consider such claims by concluding—without providing any reasoning at all—that the President violates the Emoluments Clauses only when acting privately (though, perhaps, somehow still in his official capacity). The statement assumes that the dissenters must disagree. But the argument for rehearing *en banc* is not that this previously unstated argument about the Emoluments Clauses is necessarily incorrect; it's that the court should resolve the issue openly and directly rather than covertly and implicitly. The authority to issue injunctive relief against the President is a matter of exceptional importance to which the majority opinion devoted scant attention, despite it having been raised by the parties—and despite the parties and other courts reaching a different conclusion than what we have now been told underlies the majority opinion.[31]

---

[31] The statement says that this dissent construes the complaint in the manner least favorable to the plaintiffs, but it construes the complaint only in the most natural way, based on its repeated references to actions taken in an official capacity, rather than applying an unstated and novel distinction between official capacity and official conduct, as the statement does.

The statement also inaccurately claims that this dissent argues the plaintiffs should not be allowed to amend their complaint to add claims against the President in his private capacity. If the plaintiffs can support their claim under the statement's new theory of the law, then by all means they should seek leave to amend. But how would they know to do that? The statement, issued more than three years after the operative complaint was filed, is the first time that anyone in this case has suggested that the President should have been sued in his private capacity. As the statement now reveals, the majority opinion treated the complaint as having been amended—without stating that it was doing so and without even requiring an actual amendment. But the President is not represented in this case in his private capacity, so this detail would seem to have large implications by requiring the appearance of new counsel and additional dispositive motions practice in the district court. It should not go unaddressed; a

The new discoveries do not end there. The statement at first appears to disagree with those precedents limiting the court's authority to enjoin the President in his official capacity. But then, a mere two paragraphs later, the statement recognizes the authority of precisely those precedents limiting, as the statement itself puts it, "the power of the courts to direct a President's conduct of the business of the United States." The statement does not dispute those precedents but argues the precedents do not apply because the President is acting quasi-privately here. So there turns out not to be any actual disagreement that the courts have limited authority to enjoin the President's official acts. The only disagreement is over the statement's new discovery of an official-but-still-private capacity in which the President might act.

Taken on its own terms, the statement's legal analysis is not compelling. It argues that even though a court normally will redress an injury arising from unlawful presidential action "by issuing relief against an inferior executive officer," this case is unique because "there are no inferior executive officers against whom the plaintiffs could seek declaratory or injunctive relief that would redress their injuries." But that ignores Part B of this dissent, which explains that "a plaintiff who loses a government contract due to favoritism that results from illegal emoluments might be able to sue the agency or inferior executive officer who is responsible for awarding the contract in order to redress the Emoluments Clause violation." It's true that such relief would not redress the injuries alleged by the plaintiffs in

"statement" by a single judge respecting the order denying *en banc* rehearing is not an adequate substitute for consideration by the court. The *en banc* court should have decided to clarify this hopelessly confused issue on rehearing.

28

this case, but that only highlights an additional flaw in the plaintiffs' case: they have not alleged an injury, such as harm from corrupt favoritism, that the Emoluments Clauses are designed to prevent. Rather than seeking redress for official corruption or undue influence in government, these plaintiffs effectively seek to vindicate an alleged constitutional right to fairness in the restaurant industry.

By remaining so intent on entertaining this particular lawsuit by these particular plaintiffs, the statement misses the obvious: a different set of plaintiffs alleging a more concrete injury might appropriately bring suit. Instead, the statement implies that if the plaintiffs in this case do not have standing, then it must be that redress is unavailable. That's a false choice, and it is inconsistent with applicable precedents on standing.[32] "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974).

### 2. Competitor Standing

It is not until the twelfth page that the statement gets to the central issue—competitor standing—and its discussion is revealing. The statement doubles down on the majority opinion's reliance on a *Washington Post* article about the Trump International Hotel in Washington D.C.—even though no plaintiff in this case owns or is otherwise associated with a hotel in Washington D.C.[33] The statement

[32] The Supreme Court has been "unwilling to assume that injured parties are nonexistent simply because they have not joined respondents in their suit." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 489 (1982).

[33] The statement claims that its references to the Washington hotel serve to demonstrate the injury that New York hotels might suffer. But we cannot

then conspicuously moves from concrete facts about non-plaintiffs to abstract truisms in order to justify standing for the actual plaintiffs: "the opportunity to procure the President's favor or avoid his disfavor is a highly significant motivator for a foreign diplomat or a state representative." Well, of course it is. But that general proposition does not establish that diplomatic officials in New York are lunching on *foie gras* at Jean-Georges when they really would rather have falafel at Amali.[34]

According to the statement, it doesn't matter. The statement hypothesizes that surely there must be an injury somewhere because "there are nearly 200 nations in the world (and 50 states), many of which send delegates to Washington or New York, where they become buyers whose business" *might* be directed to high-end

---

assume injury to New York hotels just because there may be injury to a hotel in Washington. "[S]tanding is not dispensed in gross" but must be established for each claim and for each plaintiff. *Town of Chester v. Laroe Estates*, 137 S. Ct. 1645, 1650 (2017). The district court in the Maryland case recognized an injury to competitors of the Trump International Hotel but dismissed claims based on "Trump Organization operations outside the District of Columbia" because "[t]here appears to be no 'actual or imminent' injury to either Plaintiff" from such activity. *District of Columbia*, 291 F. Supp. 3d at 742. Whether that court was right or wrong, at least it fulfilled its obligation to identify an injury for all claims and plaintiffs. The majority opinion, by contrast, extrapolates from one non-plaintiff in Washington to find standing for all participants in a different marketplace in New York.

[34] The statement admits that standing would not exist if "the advantage derived by the defendant from illegal conduct was small, and the likelihood was low that potential customers would be aware of it, much less motivated by that advantage to prefer the defendant over a plaintiff." Individual dining choices by foreign and state officials among Manhattan restaurants would seem to fall into this category.

Manhattan restaurants associated with the President as long as he is allegedly receiving emoluments but *might* go to different restaurants if the President were to transfer his interests in those properties to his children or to someone else. Perhaps some diplomats might behave this way, as the statement speculates. It is *possible*, however unlikely. But the majority opinion cites nothing that would give anyone a reason to believe that, say, Norway or Nevada have dispatched or will dispatch delegations to New York City to eat at Jean-Georges in the hope of enriching the President. The majority simply assumes that because there are lots of possible diplomats, at least some of them must be thinking about their dinner choices the way it hypothesizes. Yet "[t]he law of averages is not a substitute for standing." *Valley Forge Christian Coll.*, 454 U.S. at 489.[35] Pointing to a large number of theoretical lost customers is not enough for Article III injury; "allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks and alteration omitted).[36]

The statement's resort to such speculation is inconsistent with the requirement that the "plaintiff[s] must 'clearly allege facts

---

[35] *See also United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688-89 (1973) ("[P]leadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action.").

[36] One of the plaintiffs is an association of restaurants. "In part because of the difficulty of verifying the facts upon which such probabilistic standing depends, the Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm— surely not a difficult task here, when so many [customers] are alleged to have been [lost]." *Summers*, 555 U.S. at 499. And yet the majority opinion does not ask that plaintiff to identify a single lost customer.

demonstrating' each element" of Article III standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The statement suggests these post-hoc rationalizations are fine because surely the dissenters did not seek *en banc* rehearing to "express[] a wish for a new opinion supporting the same conclusion with better reasons." But because the majority opinion now serves as a precedent for future cases, its lack of good reasons is a serious problem. An opinion of the court ought to justify its conclusion with reasons grounded in precedent. It certainly is the dissenters' position that the majority opinion's departure from precedent requiring would-be plaintiffs to establish a concrete rather than a speculative injury justifies *en banc* rehearing—regardless of the opinion's ultimate conclusion. If, as the statement implies, there exists a more compelling justification for the same conclusion that the majority failed to articulate, then the court should consider that justification on rehearing.

The statement, instead, repeats the majority opinion's reliance on cases such as *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986), and *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), for the proposition that the plaintiffs' "theory of standing relies on the predictable effect of Government action on the decisions of third parties." *CREW*, 953 F.3d at 197 (alterations omitted). That reliance conflicts with the statement's new insistence that the challenged conduct has "nothing to do" with government action. And neither case involves competitor standing, which one would have thought was the "theory of standing" on which the majority opinion and the plaintiffs rely.[37]

---

[37] Even so, "[t]he President's personal receipt of income from [some businesses] surely does not have a predictable effect on the decisions of

The statement—like the majority opinion—continually looks outside the competitor-standing context for support because, within that context, we learn that plaintiffs may not invoke the competitor-standing doctrine with a "'chain of events' argument" that "depends on the independent actions of third parties" because such an argument distinguishes this case "from the 'garden variety competitor standing cases' which require a court to simply acknowledge a chain of causation 'firmly rooted in the basic law of economics.'" *New World Radio*, 294 F.3d at 172. The plaintiffs' theory in this case, dependent on a speculative chain of causation about diplomats' dining choices in New York City, bears no resemblance to a normal competitor-standing case.

Rather than rely on speculation about Norwegian lobbyists eating out at fancy Manhattan restaurants—and on inapposite cases that do not involve competitor standing—I would follow cases that address competitor standing, which must be "based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." *Already*, 568 U.S. at 99. The statement struggles mightily to sidestep these precedents. "Puzzlingly, the [statement] cite[s] a passage from Justice [Breyer's] dissenting opinion in [*Clapper*] seemingly as though it were the holding of the case," *CREW*, 939 F.3d at 158 n.13,[38] and then argues that the Court's majority did not mean what it said in its opinion

---

third parties as to whether to patronize [those businesses] nor a predictable effect of skewing the market in which the plaintiffs allegedly compete." *In re Trump*, 958 F.3d at 327 (Niemeyer, J., dissenting).

[38] See the statement's footnote 19.

because, in a footnote, the Court acknowledged that it had used different language in other opinions.

But in that very footnote the Supreme Court explained that "plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 414 n.5 (quoting *Lujan*, 504 U.S. at 562). It was on precisely this basis that the district court concluded that "it is wholly speculative whether the Hospitality Plaintiffs' loss of business is fairly traceable to Defendant's 'incentives' or instead results from government officials' independent desire to patronize Defendant's businesses." *CREW*, 276 F. Supp. 3d at 186.[39] Whether you call it a "substantial risk" of harm or a "certainly impending" harm, the plaintiffs have not demonstrated an injury sufficient to confer standing. The district court properly applied standing precedents while the majority opinion looks to inapposite cases to support its novel holding on competitor standing.

The statement also invokes antitrust and trademark precedents, but those cases provide no support for the majority opinion's new theory of competitor standing because—as the

---

[39] *See also In re Trump*, 958 F.3d at 326 (Niemeyer, J., dissenting) ("[T]he District and Maryland's theory of proprietary harm hinges on the conclusion that government customers are patronizing the Hotel *because the Hotel distributes profits or dividends to the President*, rather than due to a more general interest in currying favor with the President or because of the Hotel's branding or other characteristics. Such a conclusion, however, is not only economically illogical, but it also requires speculation into the subjective motives of independent actors who are not before the court, thus precluding a finding of causation.").

statement acknowledges—the requisite injuries in such cases are defined by statute while in this case the plaintiffs pursue an implied constitutional cause of action to redress the President's alleged noncompliance with law. It is well established that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo*, 136 S. Ct. at 1549; *Nash v. Califano*, 613 F.2d 10, 14 (2d Cir. 1980) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.").[40] In this case—unlike cases premised on antitrust, trademark, and unfair-trade-practices statutes—the plaintiffs can point to no statutory or other legal right the violation of which might serve as an injury to them. Thus, not only do the plaintiffs fail to allege facts establishing an actual rather than hypothetical injury, *see Lujan*, 504 U.S. at 560, they also cannot identify any "statutes creating legal rights, the invasion of which creates standing" in this case, *id.* at 578 (noting that "injury to a company's interest in marketing its product free from competition," for example, was "inadequate in law" to confer standing until Congress made it "legally cognizable" by statute).

Of course, the mere alleged violation of the Emoluments Clauses cannot itself serve as an Article III injury. "[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable," *id.* at 575, and Congress may not "convert the undifferentiated public interest in executive officers' compliance with

---

[40] *See also Huff v. TeleCheck Servs.*, 923 F.3d 458, 469 (6th Cir. 2019) ("Whatever is true of Congress's power to create standing by statute would seem to hold for state legislatures as well.").

the law into an 'individual right' vindicable in the courts," *id.* at 577. Nor do the Emoluments Clauses confer on the plaintiffs a particularized interest the violation of which might create standing in the absence of an otherwise cognizable concrete injury. *Id.* at 578. It is undisputed that the Emoluments Clauses do not give the plaintiffs a right to be free from the competition they allege causes them harm, and indeed they allege no unlawful conduct on the part of the businesses with which they compete. The Emoluments Clauses allegedly oblige the President, as President, to avoid receiving certain forms of income. The interest of the plaintiffs in the President's compliance with the Emoluments Clauses is therefore "common to all members of the public" and would be an "impermissible 'generalized grievance'" if it were claimed to be the basis of the plaintiffs' standing. *Id.* at 575.

The statement obscures this point by questioning the role of Congress in defining injuries and suggesting there is confusion between standing and whether an injury is within a statute's zone of interests. No doubt, there are some tensions within the doctrine.[41] But this case is not difficult. We know that "the Court has recognized Congress's authority to create new rights that allow individuals to be free from competitive injury" and that in such contexts "the violation of a private statutory right constitutes an injury-in-fact" for standing purposes. *Jeffries v. Volume Servs. Am.*, 928 F.3d 1059, 1069 (D.C. Cir. 2019) (Rogers, J., concurring in part and concurring in the judgment). Unlike the statutory contexts the statement identifies, the plaintiffs here identify no such right conferred by the legislature and must rely

---

[41] *See generally* William Baude, *Standing in the Shadow of Congress*, 2016 Sup. Ct. Rev. 197 (2016).

on their factual allegations about lost business. As discussed throughout this dissent and in the separate dissent of Judge Cabranes and statement of Judge Walker, those allegations are insufficient.

\* \* \*

For these reasons, I dissent from the denial of rehearing *en banc.*

**JOHN M. WALKER, JR., Senior Circuit Judge**
**Statement in Opposition to the Denial of *En Banc* Rehearing**[1]

The Second Circuit should have voted to rehear this case *en banc*.

The panel majority decided that plaintiffs, a co-owner of restaurants and hotels in New York and an organization that includes establishments in New York and Washington, D.C., have standing to assert an implied private right of action against the President in his official capacity for violating the Foreign[2] and Domestic[3] Emoluments Clauses of the Constitution. That decision misinterpreted the doctrine of competitor standing and impermissibly extended it to a wholly novel context. In doing so, the panel failed to address the tension in our circuit law (which is inconsistent with the law in our sister circuits) and contradicted binding Supreme Court precedent requiring a plaintiff to demonstrate more than a mere unlawful advantage to a competitor in order to invoke the competitor standing doctrine.

If that were not enough, this case warranted *en banc* review because of its exceptional national importance. The interpretation and application of the Emoluments Clauses, including the threshold question of whether private actors have Article III standing to enforce the Clauses, raise constitutional questions of first impression in this circuit and in the federal courts nationwide. This case, along with the ongoing Fourth Circuit case with parallel theories of injury,[4] will determine whether Trump business competitors have Article III standing to sue despite no showing of actual or imminent injury traceable to the President's receipt of emoluments, or how the cessation of emoluments would redress any such injury.[5] A novel question of such profound national importance, involving the President and the separation of powers, warranted *en banc* review.

I.

---

[1] Although, as a senior judge, I have no vote on whether to rehear a case *en banc*, Fed R. App. P. 35(a), and thus cannot dissent, this court is currently reviewing whether, as a matter of court practice, a senior judge that was on the panel may file a statement on the denial of *en banc* rehearing. In the meantime, a ruling by the chief judge, with the concurrence of the court's active judges, has permitted such a statement pending the outcome of the review.

[2] "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. 1, § 9, cl. 8.

[3] "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7.

[4] In the Fourth Circuit case, the District of Columbia and the State of Maryland sued the President in his official capacity on the same theory of injury advanced in this lawsuit. After holding that plaintiffs had standing to sue with respect to the Trump International Hotel in Washington, D.C., *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 732 (D. Md. 2018), the district court declined to certify that question for interlocutory appeal, *District of Columbia v. Trump*, 344 F. Supp. 3d 828, 844 (D. Md. 2018). The Fourth Circuit (*en banc*) denied the President's mandamus petition to direct the district court either to certify the interlocutory appeal or to dismiss the complaint. *In re Trump*, No. 18-2486, 2020 WL 2479139 (4th Cir. May 14, 2020).

[5] Legislators in the House and Senate brought a third suit in the D.C. Circuit, alleging that the President's failure to seek congressional approval for his receipt of emoluments, despite the Clauses' requirement of such approval, deprived them of their right to vote and thereby caused them an Article III injury. The D.C. Circuit recently held that the plaintiffs lacked standing for want of a cognizable injury. *Blumenthal, et al. v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020) (per curiam).

1

The panel majority misconceived the competitor standing doctrine and, in doing so, violated the fundamental tenets of Article III standing. The majority held that plaintiffs have shown traceable competitive injury by adequately alleging that (i) they "personally compete[] in the same arena" as the Trump establishments[6] and that (ii) an illegal act—here, an alleged violation of the Emoluments Clauses—bestowed "some competitive advantage" on Trump establishments.[7] The majority was wrong. Contrary to the majority's holding, plaintiffs may not avail themselves of the competitor standing doctrine without a showing of actual or imminent injury.

The competitor standing doctrine does not relax the basic requirements of Article III standing that "an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."[8] Rather, the doctrine affords a plaintiff-competitor the presumptions of injury, traceability, and redressability in certain discrete contexts in which "economic logic"[9] tells us that an unlawful benefit, bestowed upon a defendant-competitor as the result of some government action or violation of a rule, will predictably cause the plaintiff-competitor to suffer an injury in fact.[10] This showing of a likelihood of personal injury to the plaintiffs is critical, and has been required not only by the Supreme Court but also by our sister circuits.[11] Yet the majority has omitted that requirement from its analysis entirely.

This court has been inconsistent in requiring a showing of personal injury. As Judge Menashi observes in his dissent, this court has previously announced two different versions of the competitor standing doctrine without reconciling the differences. The earlier, stricter version appropriately requires a plaintiff-competitor to make two showings. First, "to establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit."[12] Second, and critically, a plaintiff must also show personal disadvantage beyond baldly "asserting that an advantage to one competitor adversely handicaps the others."[13] Together, these requirements make clear that plaintiffs invoking competitor standing must plausibly plead not only that they compete in the

---

[6] Maj. op. 17 (quoting *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989)).

[7] *Id.* (quoting *Fulani v. League of Women Voters Edu. Fund*, 882 F.2d 621, 626 (2d Cir. 1989)).

[8] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citing *Horne v. Flores*, 557 U.S. 443, 445 (2009)).

[9] *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008); *see also Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (citing *Canadian Lumber* for this "economic logic" requirement).

[10] Although the required degree of certainty varies across circuits, our sister circuits have consistently maintained that a competitor must demonstrate that the defendant's unlawful gain will, *with some degree of certainty*, cause the plaintiff to suffer an injury in fact. The First Circuit has required "sufficient likelihood" of specific harm to the plaintiff. *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993). The Federal Circuit has required a showing that the plaintiff will "likely suffer" an injury in fact. *Canadian Lumber*, 517 F.3d at 1332. The D.C. Circuit has explained that the "nub" of the competitor standing doctrine is that the challenged action will "almost surely cause petitioner to lose business." *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995). But no matter the level of certainty required, if that certainty is absent, no economic logic exists, and the competitor standing doctrine cannot supply the concrete and imminent injury necessary for Article III standing.

[11] *See Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) (rejecting plaintiff's theory that, under the competitor standing doctrine, "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful"); *see, e.g.*, *El Paso Nat. Gas Co.*, 50 F.3d at 28 ("We therefore caution that even if El Paso were 'competing' with the LDCs in Mexico, that would not necessarily bring petitioners within the ambit of our 'competitor standing' cases. El Paso would still be required to allege facts demonstrating 'injury in fact.'").

[12] *In re U.S. Catholic Conference*, 885 F.2d at 1029.

[13] *Id.* at 1030.

2

same arena as the defendant who received an unlawful advantage, *but also* that they were personally harmed.

In later cases, this court has left the personal harm requirement out of the competitor standing test. That version collapses the original test by allowing a plaintiff to fulfill the second requirement (personal harm) simply by fulfilling the first (competition plus unlawful advantage to the defendant). This was enough to satisfy the panel majority in this case, but it has not satisfied the Supreme Court. In *Already, LLC v. Nike, Inc.*,[14] Already, a maker of athletic shoes, claimed standing to challenge the validity of a Nike trademark on the basis that it was Nike's competitor in the athletic shoe market. Already sought to challenge the trademark even after Nike had issued a covenant not to bring trademark claims against Already for present or future products that potentially infringed the trademark.[15] Already's theory of competitive injury was that the continued existence of Nike's allegedly unlawful mark, notwithstanding the covenant, deterred investment in its company, thereby placing Already at a competitive disadvantage. The Court explicitly rejected that theory, explaining that "[t]aken to its logical conclusion, [Already's] theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful—whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on. We have never accepted such a boundless theory of standing."[16]

The *Already* court viewed the competitor standing doctrine as an application—not a relaxation—of the "irreducible constitutional minimum of standing" required by Article III.[17] The personal injury requirement is necessary to ensure that a plaintiff-competitor's injury is "actual or imminent" and "fairly traceable" to the defendant's actions.[18] To be sure, in some circumstances, competitive injury is so predictable and certain that we can say, as a matter of economic logic, that it will "almost surely" occur,[19] or that the plaintiffs will "likely suffer" an injury in fact,[20] or that there is a "sufficient likelihood" of personal injury[21]—whatever degree of certainty is required by a particular circuit. But only then does the competitor standing doctrine permit a plaintiff to show standing without making a specific showing of injury. Plaintiffs have simply not shown that those circumstances are present in this case.

Rather, plaintiffs have failed to plead facts that show that economic logic connects the alleged emoluments to President Trump (the share of profits personally received by the President from hotel bookings or restaurant patronage by foreign and state officials) to any decrease in plaintiffs' business. As Judge Menashi aptly observes, this market is the very opposite of one with 1,000 buyers and two sellers. There, economic logic dictates that an unfair advantage to seller A will

---

[14] 568 U.S. 85 (2013).

[15] *See id.* at 88–89.

[16] *Id.* at 99.

[17] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[18] *Id.* (alterations omitted).

[19] *El Paso Nat. Gas Co.*, 50 F.3d at 27.

[20] *Canadian Lumber*, 517 F.3d at 1332.

[21] *Adams*, 10 F.3d at 923.

almost surely harm seller B, such as might be true of the competition between Boeing and Airbus.[22] Here, in contrast, plaintiffs and defendant compete in a diverse hotel and restaurant market with many sellers and many variables. In this context, plaintiffs have not shown that an unlawful benefit to a Trump business from increased patronage, much less the President's personal share, is sufficiently likely[23] (let alone almost sure)[24] to cause harm to plaintiffs' businesses. As the district court correctly observed, myriad factors such as "service, quality, location, price and other factors related to individual preference"[25] might influence a foreign or state official's independent third-party decision whether to patronize a Trump business.[26] With so many variables at play, the challenged conduct of a single defendant competing over a small set of customers in a virtual sea of luxury hotels and restaurants will not be "almost sure[]"[27] or even "sufficient[ly] like[ly]"[28] to cause plaintiffs harm. The fact that it possibly could is not enough, and plaintiffs have not alleged anything more.

In the absence of compelling economic logic, plaintiffs could marshal specific evidence to show that they were personally harmed by the unlawful benefit conferred on their competitor. But plaintiffs here have failed to allege a "concrete, particularized, and actual or imminent" injury in fact under the standard Article III requirements.[29] Plaintiffs have also failed to identify any particularized disadvantage, or an instance in which government customers chose to patronize the President's hotels and restaurants instead of their own. This failure is underscored by plaintiffs' own complaint, which does allege that a *different* competitor, the Four Seasons—who is not a plaintiff in this suit—lost identifiable business to the President's businesses when the government of Kuwait cancelled its reservations and switched to a Trump hotel. But plaintiffs make no similar allegation of their own personal injury, and they are not purporting to sue on behalf of anyone else who allegedly suffered such a loss.

The competitor standing doctrine does not permit a plaintiff to end-run around Article III's requirements of injury, traceability, and redressability simply because a competitor in the same market has received an allegedly unlawful benefit. Because this watered-down standing requirement now appears to be the law of the circuit, this case should have been reheard *en banc*.

II.

---

[22] The competition between Boeing and Airbus has been characterized as a duopoly, with those two companies accounting for ninety-nine percent of the large plane market. *See, e.g.*, Praveen Duddu, *Airbus vs Boeing: A Tale of Two Rivals*, AEROSPACE TECHNOLOGY, Jan. 31, 2020, https://www.aerospace-technology.com/features/airbus-vs-boeing/; Kate Sprague, *Why the Airbus-Boeing Duopoly Dominate 99% of the Large Plane Market*, CNBC, Jan. 26, 2019, https://www.cnbc.com/2019/01/25/why-the-airbus-boeing-companies-dominate-99percent-of-the-large-plane-market.html.

[23] *See Adams*, 10 F.3d at 923.

[24] *See El Paso Nat. Gas Co.*, 50 F.3d at 27.

[25] *Citizens for Responsibility & Ethics in Washington, et al. v. Trump*, 276 F. Supp. 3d 174, 186 (S.D.N.Y. 2017).

[26] *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (stating that a federal court acts only to redress injury traceable to the defendant "and not injury that results from the independent action of some third party not before the court").

[27] *El Paso Nat. Gas Co.*, 50 F.3d at 27.

[28] *Adams*, 10 F.3d at 923.

[29] *Monsanto*, 561 U.S. at 149.

4

In my panel dissent, I postulated a hypothetical that shows the absence of the required economic logic in this case: a competitor plaintiff who sues a competing restaurant that used a fraudulently obtained bank loan or tax refund to improve its business, such as by hiring a new chef or lowering prices, thereby increasing its market competitiveness. The majority denied that its approach would confer competitor standing in my hypothetical because "[a] plaintiff who establishes an injury-in-fact by alleging direct competition and an inability to compete with the defendant on an equal footing must also establish that such injury is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."[30] That cursory response simply restated the basic rules of Article III standing, which are met neither by my hypothetical nor by the facts in this case; it does nothing to show how my hypothetical would not lead to a finding of competitor standing under the majority's conception of the doctrine.

The majority's response is especially incongruous with the structure and purpose of the competitor standing doctrine itself. That doctrine affords a plaintiff the presumptions of injury, traceability, and redressability to alleviate the requirement of a specific showing where doing so would be difficult in certain competitive contexts. So, it makes no sense to say that, in a case properly applying the competitor standing doctrine, a separate requirement to show traceability and redressability would prevent my hypothetical plaintiff from showing standing.

The majority's effort to distinguish this case from my hypothetical is also fundamentally flawed in that it mischaracterizes the harm that plaintiffs allege. The majority concludes that the "connection between the alleged violations of law and Plaintiffs' harm is far more direct" than it is in my hypothetical, because it is "precisely the President's receipt of allegedly illegal emoluments that constitutes Plaintiffs' competitive injury."[31] Not so. Plaintiffs nowhere allege that whatever injury they claim was caused *by the President's receipt of emoluments*. Instead, on the facts as plaintiffs have alleged them, it is not the conferral of emoluments that causes harm to plaintiffs' businesses, but instead foreign and state officials' preference to patronize Trump establishments rather than plaintiffs' own.

Those harms are distinct. The one that plaintiffs have alleged could easily persist absent any conferral of emoluments—that is, even if the President's personal gains from the patronage of foreign and state officials were removed from the calculus. Foreign diplomats and state officials might, quite lawfully, still choose the Trump establishment over plaintiffs' establishments to attempt to curry favor with the President. Plaintiffs point to a Washington Post article revealing that certain diplomats stated in interviews that "spending money at Trump's hotel is an easy, friendly gesture to the new president"[32]—but nothing in the article says the friendliness of the gesture is tied to the President's personal receipt of profits from that patronage. Indeed, a group of former national security officials writing as *amici curiae* warned that foreign officials, attempting to "curry favor through private business relations with senior U.S. officials," will "seek

---

[30] Maj. op. 34 (internal quotation marks, citations, and modifications omitted).

[31] *Id.* at 34–35.

[32] Appellants' Reply Br. 12 (quoting Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place to Be*, WASH. POST, Nov. 18, 2016, https://www.washingtonpost.com/business/capitalbusiness/2016/11/18/9da9c572-ad18-11e6-977a-1030f822fc35_story.html.

to use all available rewards or incentives to influence the behavior of other nations."[33]  Regardless of whether any of their money finds its way into the President's pocket, foreign diplomats can still come to Washington or New York and, when they meet the President, tell him that they are staying at Trump hotels and dining at Trump restaurants.  That ingratiation, not the supposed emoluments themselves, is what plaintiffs have alleged to be the source of any adversity against their business.  But ingratiation is not an emolument.  And if the emoluments are stopped, nothing suggests that the ingratiation will not remain.[34]

III.

Apart from the confusion caused by the panel majority's misapplication of the competitor standing doctrine, *en banc* rehearing should have been ordered for another reason.  Plaintiffs have sued the President in his official capacity and are seeking injunctive relief against him in that capacity.  The Supreme Court has made clear that the standing inquiry is "especially rigorous" where, as here, the dispute implicates the separation of powers.[35]  This weighty and complex suit should not be permitted to proceed based on plaintiffs' speculation and conjecture that the President's receipt of a share of profits for meals and lodging, from a limited group of people, is causing them competitive harm.  And, as Judge Menashi observes, because it is questionable that this court (or any court) is empowered to order the injunctive relief against the President that the panel majority posits—but that plaintiffs never specifically asked for in their pleadings, that relief may not be available at all.

Interpretation and application of the Emoluments Clauses is entirely novel in this circuit and in the federal courts nationwide.  The unprecedented application of the competitor standing doctrine in a situation where economic logic is absent invites uncertainty and impermissibly waters down the Article III standing requirements.  The dissonance between our and other circuits' treatment of the competitor standing doctrine only exacerbates that uncertainty.  Equally, if not more important, the case asserts standing to invoke judicial authority in an implied private right of action under the Constitution against the President in his official capacity.  In this new and highly significant area of law, this court has a responsibility to do everything it can to address the confusion over the standing doctrine that this case has fostered.  Granting *en banc* review would have fulfilled that responsibility.

---

[33] Brief of Former National Security Officials as Amici Curiae Supporting Plaintiffs-Appellants, *Citizens for Responsibility & Ethics in Washington v. Trump*, No. 18-474, 2019 WL 8165708 (2d Cir. Sept. 13, 2019), *as amended* (Mar. 3, 2020) (no. 18-474).

[34] The Trump Organization publicly claims to have remitted profits from foreign-government business to the U.S. Treasury: approximately $150,000 in 2016 and $191,000 in 2017. *See* Rebecca Ballhaus, *Trump Organization Details Level of Profits from Foreign Governments*, WALL ST. J., Feb. 25, 2019, https://www.wsj.com/articles/trump-organization-details-level-of-profitsfrom-foreign-governments-11551116974. This is an infinitesimal amount in relation to the President's reported net worth of $3 billion in 2019. *See* Shahien Nasiripour & Caleb Melby, *Trump's Net Worth Rises to $3 Billion Despite Business Setbacks*, BLOOMBERG, June 12, 2019, https://www.bloomberg.com/news/articles/2019-06-12/trump-s-net-worth-rises-to-3-billion-despite-businesssetbacks. Although these specific amounts remain untested and unconfirmed, the public claim of remittal undermines any argument that foreign officials' desire to confer a relatively modest financial benefit on the President is the driving force behind increased competition. And plaintiffs have not alleged or anywhere argued that business from foreign officials to the Trump Organization has decreased as a result of that remittal.

[35] *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

PIERRE N. LEVAL, *Circuit Judge*:
Statement in Support of the Denial of *En Banc* Rehearing

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies," thus requiring that there be real and concrete adversity between the parties, so that courts not be empowered to give advisory opinions on hypothetical disputes. *See Baker v. Carr*, 369 U.S. 186, 204 (1962) (Article III standing "assure[s] that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult [] questions"). On a daily basis, federal courts adjudicate disputes among competitors involving claimed violations of federal and state law (including antitrust, unfair competition, trademark, false advertising, and false designation of origin) based on allegations of *substantial risk* of competitive injury no different than what the plaintiffs have alleged here. Judge Menashi does not dispute this. *See generally CREW v. Trump*, __ F.3d __ (2d Cir. 2020) (Menashi, J., dissenting from denial of rehearing *en banc*) (hereinafter "Menashi Dissent"). Nonetheless, he argues that, at least for this case, nothing short of certainty of injury can satisfy Article III;[1] and that precedents finding sufficient adversity to support exercise of jurisdiction over claims expressly authorized by legislative texts have no pertinence because those claims derive from statutes, while this one is based on the Constitution, *id*. at 34–35.

---

[1] Menashi Dissent at 4 ("If the injury is not certain or 'certainly impending' . . . the requirements of Article III are not met." (citation omitted)).

Judge Menashi also characterizes President Trump's indisputably private sales of hotel and restaurant services to foreign and domestic governments (and his receipt of revenues from those sales) as "actions taken by one of the other two branches of the Federal Government," *id.* at 1, and suggests that a court's declaration that such sales violate the Emoluments Clauses might amount to impermissibly instructing the President how to carry out the duties of his office, *id.* at 15. In this Statement, I respond to Judge Menashi's arguments.

I.

Suggesting that the courts have neither jurisdiction nor authority to instruct the President on how to conduct the business of the Executive Branch, Judge Menashi questions whether a ruling for the plaintiffs in this case would be instructing the President "how to exercise the executive power," an act "tantamount to telling a member of Congress to vote to pass or repeal a particular law." *Id.* at 15 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 826–27 (1992) (Scalia, J., concurring)). Putting aside whether courts have jurisdiction to hear a suit seeking an injunction or declaratory relief against the President on the grounds that his official acts on behalf of the United States violate the Constitution, the proposition has no application to this case, which questions the lawfulness of the President's purely private conduct of selling hotel and restaurant services. The Foreign Emoluments Clause forbids any "Person holding any Office of Profit or

2

Trust" of the United States from "accept[ing] any . . . Emolument . . . of any kind whatever, from any . . . foreign State." U.S. CONST. art. I, § 9, cl. 8. The Domestic Emoluments Clause provides that "the President . . . shall not receive within [the period of his presidency] any other Emolument [other than his presidential salary] from the United States, or any of them." U.S. CONST. art. II, § 1, cl. 7. The theory of the complaint is that, in his personal receipt of payments by foreign states and domestic state governments to his establishments, the President violates the prohibitions of those clauses of the Constitution. The complaint does not challenge anything the President has done or will do on behalf of the United States. It challenges only the President's private conduct. Indeed, if those payments from domestic or foreign governments were accepted by the President *on behalf of the United States*, so that those payments went into the federal treasury, rather than enriching President Trump, they would not be an emolument *of the President* and would not even arguably violate the Constitution.

In support of his argument that the courts have no jurisdiction to hear this case, Judge Menashi cites a number of precedents that have no pertinence to this complaint because they involved the question of the power of the courts to direct a President's conduct *of the business of the United States*. The Supreme Court's 1866 decision in *Mississippi v. Johnson* related to whether the federal courts may "enjoin the President in the performance of his official duties." 71 U.S. 475, 501 (1866). In that case, the State of Mississippi sought to enjoin the President from using the power of

3

the Executive Branch to enforce an allegedly unconstitutional law. *Id.* at 497–98. Likewise, in *Franklin v. Massachusetts*, the plaintiffs sought a court order declaring the President's exercise of Executive power to be unlawful and requiring the President and his subordinates to conduct the duties of the Executive Branch in a particular manner. 505 U.S. 788, 790–91 (1992).[2] In

---

[2] As Judge Menashi notes, *see* Menashi Dissent at 16–17, in most cases, a court may redress an injury arising from unlawful Presidential action by issuing relief against an inferior executive offer. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–89 (1952) (declaring President Truman's executive order directing the seizure of steel mills unlawful where the defendant was Truman's Secretary of Commerce); *Franklin*, 505 U.S. at 803 ("[W]e need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary [of Commerce] alone."). In this case, however, because the President's allegedly unlawful acts are personal acts done for his own benefit and not in the name of, or for the benefit of, the United States, there are no inferior executive officers against whom the plaintiffs could seek declaratory or injunctive relief that would redress their injuries. *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (noting that in "rare instances . . . only injunctive relief against the President himself will redress [the plaintiffs'] injury"). This fact, however, does not mean that the plaintiffs' injuries are beyond the reach of judicial redress. *See Nat'l Treasury Emp. Union v. Nixon*, 492 F.2d 587, 613 (D.C. Cir. 1974) ("[I]t would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control when he . . . has delegated the performance of duties to federal officials subordinate to [him] and one or more of them can be named as a defendant.").

Judge Menashi also contends that my observation that injunctive or declaratory relief against an inferior executive officer cannot redress the plaintiffs' injuries "highlights a[] [] flaw in the plaintiffs' case: they have not alleged an injury . . . that the Emoluments Clauses are designed to prevent." Menashi Dissent at 29. I see no logic in the argument. The question whether the plaintiffs are at substantial risk of injury is entirely distinct from whether the injury may be redressed by relief against an inferior officer or only by relief against the President himself, and whether the plaintiffs' injury falls within the concerns of the Emoluments Clauses.

that case, the plaintiff challenged a decision of the President relating to how overseas federal employees are counted in the census for purposes of the apportionment of state representatives to the House of Representatives. *Id.* at 790–91. And *Swan v. Clinton* questioned whether the President had used his Executive power unlawfully by removing from office a member of the Board of the National Credit Union Administration without cause, and sought an injunction directing the President to reinstate the plaintiff. 100 F.3d 973, 975–77 (D.C. Cir. 1996).

Those authorities have no pertinence to this case because this complaint has nothing to do with the President's exercise of his official duties. The judicial order sought by the plaintiffs pertains only to the President's personal behavior. What the plaintiffs seek is not at all like "telling a member of Congress to vote to pass or repeal a particular law." Menashi Dissent at 15.[3]

---

Lastly, Judge Menashi says I imply that the plaintiffs must have satisfied Article III because "if [they] have no standing to sue, no one would have standing." *Id*. I make no such argument. I say only that the plaintiffs have established standing under well-established Article III standards, and that the unavailability of relief from an inferior officer does not in any way negate the likelihood of injury to the plaintiffs sufficient to establish federal court jurisdiction.

[3] Indeed, during the course of the Emoluments Clause suit filed against the President in the District of Maryland, the President conceded that, by challenging his receipt of revenues from his hotel and restaurant establishments, plaintiffs based their claims on the President's "private business pursuits . . . having nothing to do with the President's service as President." Memorandum in Support of Defendant's Motion to Dismiss at 30, *District of Columbia v. Trump*, 315 F. Supp. 3d 875 (D. Md. 2018) (No. 8:17-cv-01596), Dkt.

A grant of declaratory or injunctive relief would affect only the President's private, unofficial business dealings; it would in no way "interfer[e] with the exercise of Executive discretion." *Johnson*, 71 U.S. at 501. Nor would it "requir[e] [the President] to exercise the 'executive Power' in a judicially prescribed fashion," *Franklin*, 505 U.S. at 826 (Scalia, J., concurring), or pose any "danger[] of intrusion on the authority and functions of the Executive Branch," *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982).[4] I know no authoritative precedent that would preclude court-ordered relief should the plaintiffs prevail on the merits, and there is no reason to suggest that a judicial order affecting the President's personal receipt of revenues from his hotel businesses would impermissibly interfere with the exercise of Executive power. *See Clinton v. Jones*, 520 U.S. 681, 701–05 (1997) (concluding that "the federal courts have power to

No. 21-1. The President's later filing in the same case, cited by Judge Menashi, *see* Menashi Dissent at 25 n.30, did not contradict this earlier concession. *See* Memorandum in Support of Motion to Dismiss on Behalf of Defendant in His Official Capacity at 14–15, *Trump*, 315 F. Supp. 3d 875, Dkt. No. 112-1. That filing argued that the district court was "mistaken" to conclude that "this dispute has 'nothing' to do with" the President's official duties only because "[h]ad the President not been elected, and thereby assumed the duties of that office, no claim would lie against him under the Emoluments Clauses." *Id.* It is entirely correct that the alleged unlawfulness of the President's sale of hotel and restaurant services depends on his holding office as an officer of the United States. But it in no way follows from that fact that his sales of restaurant and hotel services are official acts done on behalf of the United States.

[4] *See In re Trump*, 958 F.3d 274, 288 (4th Cir. 2020) (en banc) ("The duty to obey [the Emoluments Clauses] . . . flows from the President's status as head of the Executive Branch, but this duty to obey neither constitutes an official executive prerogative nor impedes any official executive function.").

determine the legality of [the President's] unofficial conduct" because "[t]he litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power").[5]

## II.

While the conduct addressed by the complaint is wholly private and not official, it is of course true that what renders that private conduct illegal under the theory of the complaint is the fact that the beneficiary of the emoluments holds "[an] Office of Profit or Trust" in the government of the United States, U.S. CONST. art. I, § 9, cl. 8 (Foreign Emoluments Clause), indeed holds the office of the President, U.S. CONST. art. II, § 1, cl. 7 (Domestic Emoluments Clause). Presumably for that reason, the attorneys for the plaintiffs named President Trump as a defendant "in his official capacity," reflecting the recognition that, were Mr. Trump not a federal

---

[5] *Cf. Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (affirming the district court's grant of declaratory relief holding that the President's "blocking" of several plaintiffs from his Twitter account violated the First Amendment), *reh'g denied*, 953 F.3d 216; Complaint at ¶ 16, *Knight v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) (No. 1:17:-cv-05205) ("Defendant Donald Trump . . . is sued in his official capacity only."); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982) ("It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States.") (citing, *inter alia*, *United States v. Nixon*, 418 U.S. 683 (1974)); *Halperin v. Kissinger*, 606 F.2d 1192, 1211–12 (D.C. Cir. 1979) ("[A] proper regard for separation of powers does not require that the courts meekly avert their eyes from presidential excesses while invoking a sterile view of three branches of government entirely insulated from each other.").

office holder, his receipt of emoluments from domestic or foreign governments would not fall within the restrictions of the Constitution. Judge Menashi interprets the complaint's statement that it sues the President "in his official capacity" to mean that the complaint seeks judicial orders that would control the actions of the President in the exercise of his "official powers," which Judge Menashi contends is beyond the court's jurisdiction. *See* Menashi Dissent at 15. Judge Menashi further asserts that our treatment of the complaint as challenging personal, non-official acts of the President is inconsistent with the plaintiffs' "deci[sion] to pursue claims against the President only in his official capacity." *Id.* at 25 n.30. The complaint's naming of the President in his "official capacity" is arguably necessary because it is the President's official capacity as an officer of the United States that renders his private conduct illegal under the theory of the complaint.[6] It does not follow from naming the President in his official capacity that the suit is directed against official conduct of the President, or that the conduct the plaintiffs challenge must be characterized as "official"

---

[6] Indeed, in seeking dismissal of a similar suit before the District of Maryland, the President argued that there was "no cause of action against the President in his individual capacity under the Emoluments Clauses." Memorandum in Support of Motion to Dismiss on Behalf of Defendant in His Individual Capacity at 14–17, *District of Columbia v. Trump*, 315 F. Supp. 3d 875 (D. Md. 2018) (No. 8:17-cv-01596), Dkt. No. 112-1.

business of the Executive Branch.[7] Judge Menashi's suggestion to the contrary construes the complaint as meaning something it obviously does not mean. There is no inconsistency in recognizing that a President's personal receipt of moneys is private conduct, notwithstanding a complaint's naming the President in his official capacity because his office is what renders that private conduct unlawful.[8]

---

[7] *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 746–47 (D. Md. 2018) (dismissing the argument that, because President Trump was sued in his "official capacity," the suit "amounts to a suit against the United States" because "it is clear that the gist of [plaintiffs' Emoluments Clauses challenges] is that the President's purported receipt of emoluments . . . has nothing at all to do with his 'official duties'"), *mandamus denied on reh'g sub nom. In re Trump*, 958 F.3d 274 (4th Cir. 2020) (en banc).

[8] Judge Menashi seeks to support his argument by citation to the Supreme Court's recent statement that, in the context of an intervention by President Trump to quash congressional subpoenas for his personal records, the "interbranch conflict [between Congress and the Executive] does not vanish simply because the subpoenas seek personal papers." *See* Menashi Dissent at 15–16, 22, 23 n.24 (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020)). But that statement must be read in context. The Court's separation-of-powers analysis in *Mazars* stemmed from its concern that, without "limits on the congressional power to subpoena the President's personal records," Congress could abuse its power to secure information needed to legislate, instead using that power to "harass" the President. 140 S. Ct. at 2034. Accordingly, one of the Court's primary concerns was to ensure the subpoenas at issue were justified by (and narrowly tailored to) a "valid legislative purpose" — and were not impermissible attempts to "inquire into [the President's] private affairs" or to "expose for the sake of exposure." *See id.* at 2031–32. In that context, the fact that the subpoenas were for "personal papers" rather than official ones posed "a *heightened* risk of such impermissible purposes," and therefore of a separation-of-powers problem, "precisely because of the documents' personal nature and their less evident connection to a legislative task." *Id.* at 2035 (emphasis added).

That point does not support Judge Menashi's argument, which questions whether the federal courts have the power to adjudicate whether the President's purely private

Further, if the complaint is ambiguous as to whether it challenges official or personal acts of the President, it is the obligation of courts in assessing the legal sufficiency of a complaint to construe ambiguities in the manner most favorable to the plaintiff. *See Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (noting that, when considering a motion to dismiss under Rule 12(b)(1), the court must "constru[e] all ambiguities" and "draw[] all inferences in [the] plaintiff's favor" (citations and internal quotation marks omitted)). This is to preserve the complaint notwithstanding that a possible, but not necessarily correct, meaning of an ambiguous passage would require its dismissal. By construing an ambiguity in the complaint in the manner least favorable to the plaintiff so as to require its dismissal, Judge Menashi disregards the basic principle that we are required to do the opposite in considering a motion to dismiss. In any event, even if the plaintiffs' decision to sue President Trump "in his

conduct is unlawful. Indeed, the *Mazars* Court explicitly distinguished the separation-of-powers concerns raised by a congressional subpoena from the constitutional concerns raised by judicial proceedings against the President, *see id.* at 2034 (citing *In re Sealed Case*, 121 F.3d 729, 753 (D.C. Cir. 1997)), and reaffirmed its prior unanimous opinion in *Clinton v. Jones* holding that a sitting president is amenable to civil litigation particularly where, as here, "there is no possibility that the decision will curtail the scope of the official powers of the Executive Branch." 520 U.S. at 701; *see also Mazars*, 140 S. Ct. at 2036 (citing *Clinton*). While in *Mazars* the personal nature of the papers subpoenaed by Congress made it *less* likely the subpoenas fell within Congress's legitimate authority, here the personal nature of President Trump's operation of his private business makes it all the *more* likely that adjudication of the dispute will not involve the court in any inappropriate interference with Executive prerogative. *See Clinton*, 520 U.S. at 701.

official capacity" somehow required treating the complaint as directed against the exercise of the President's official powers notwithstanding its obvious contrary intention, the plaintiffs should be allowed to amend their complaint to state that President Trump is sued "in both his official and his personal capacities." Rule 15(a)(2) of the Federal Rules of Civil Procedure provides, "The court should freely give leave [to amend a complaint] when justice so requires."[9]

---

[9] Judge Menashi objects to the suggestion that, if it were necessary in order for this suit to proceed, the plaintiffs should be permitted to amend the complaint to explicitly name the President in his individual capacity. He argues that this would "have large implications" because the President does not have counsel to represent him in his individual capacity. Menashi Dissent at 27 n.31. But the President could simply retain counsel for that purpose. Although the suit has been pending for over 3 years, it has not yet reached its first substantive phase. Up to now the litigation has been entirely consumed with whether it may be heard by the court. In a similar case before the District of Maryland, after the court granted the plaintiffs leave to amend their complaint to add the President "in his individual capacity," the President promptly retained counsel for that purpose. *See* Notice of Appearance, *District of Columbia v. Trump*, 315 F. Supp. 3d 875 (D. Md. 2018) (No. 8:17-cv-01596), Dkt. No. 109.

Judge Menashi further argues that the majority opinion impermissibly "treated the complaint as having been amended — without stating that it was doing so and without even requiring an actual amendment." Menashi Dissent at 27 n.31. He is mistaken. The majority opinion did not deem it necessary for the plaintiffs to amend the complaint to state a claim that falls within the jurisdiction of a federal court. Neither this statement, nor the majority opinion, treats the complaint as if it had been amended. I merely observe that, if the district court illogically viewed the naming of the President "in his official capacity" as necessarily meaning that the conduct complained of was official conduct and that this took the complaint outside the scope of the court's jurisdiction, the proper ruling for the district court would have been to allow the plaintiffs to amend the complaint to clarify that the conduct from which it seeks relief is private conduct.

III.

Judges Walker and Menashi contend that our finding of standing depends on relaxation of the Article III standard to the point that *any* advantage realized by a defendant would give standing to all competitors. The justification for the panel opinion's finding of standing, however, was that the facts alleged persuasively show a very substantial likelihood of injury to the Trump competitors. Judge Walker acknowledges that when injury to a plaintiff competitor will "likely" result from the defendant's conduct, that is sufficient to establish standing.[10] No relaxation of that standard is required to recognize that injury to competitors of the Trump establishments in the field of high-end, luxury hotels and restaurants will likely result from the powerful motivation of governmental patrons to curry favor with the President by spending money in his establishments.

The logic supporting a substantial likelihood of injury to competitors of the Trump hotels and restaurants is simple and compelling. With respect

---

[10] Judge Walker's statement asserts, "To be sure, in some circumstances, competitive injury is so predictable and certain that we can say, as a matter of economic logic, that it will 'almost surely' occur, *or that the plaintiffs will 'likely suffer' an injury in fact*, or that there is a 'sufficient likelihood' of personal injury—whatever degree of certainty is required by a particular circuit. But only then does the competitor standing doctrine permit a plaintiff to show standing without making a specific showing of injury." *CREW v. Trump*, __ F.3d __ (2d Cir. 2020) (Walker, J., statement on denial of rehearing *en banc*, at 3) (hereinafter "Walker Statement") (emphasis added) (citations omitted). As discussed below, Judge Walker's suggestion that a plaintiff's likelihood of future injury must be at or near "certainty" misstates the standard for establishing an Article III injury-in-fact. *See infra*.

to the Foreign Emoluments Clause claim, the President exercises control over the foreign relations of the United States, negotiates its treaties, in many regards sets the terms of trade with foreign nations,[11] and presides over its Armed Forces. As the United States is the richest and most powerful nation in the world, provides foreign aid and military defense support to many nations, and provides the richest markets for the sale of products made all over the world, there is scarcely a nation that does not seek benefits from the United States in its diplomatic dealings. Governments and their diplomats from all over the world perceive it as crucial to their success in diplomacy with the United States to secure the personal goodwill of the President and avoid the risk of incurring his displeasure. The President's favor is a lucrative prize for a foreign diplomat whose visits to our country often have the purpose of seeking some favorable action from the government which the President largely controls. It is therefore the business of a diplomat, whose mission depends on such favorable action, to use any available means to seek the President's favor and to avoid the risk of displeasing him. It is an "accepted tenet of modern statecraft" that diplomats will "seek to use all available rewards or incentives to influence" the President. Brief of Former National Security

---

[11] *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 550–51 (1976) (discussing the President's power, under Section 232(b) of the Trade Expansion Act of 1962, to "take such action . . . to adjust the imports of [articles of commerce by imposing quotas and tariffs] . . . [so that they do not] threaten to impair the national security").

Officials as Amici Curiae at 25–26, *CREW v. Trump*, 953 F.3d 178 (2d Cir. 2019) (No. 18-474). In addition, the President, according to the allegations of the complaint, has announced to the world his favoritism for nations that patronize his businesses.[12] It follows with undeniable logic that the envoys of foreign nations, who are free to choose otherwise equivalent venues, will be strongly motivated to choose the President's establishments, so as to advance their objective of currying the President's favor, and to avoid the risk of displeasing him by choosing his competitors. This likelihood is substantiated not only by obvious logic but by the complaint's references to explicit statements of foreign diplomats. One of those diplomats, quoted in the Washington Post, stated: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?'" Second Am. Compl. ¶ 62. Another said: "Believe me, all the delegations will go there." *Id.*[13] Similar economic logic

---

[12] *See* Second Am. Compl. ¶ 96 ("Trump said [of the Saudis, in the context of discussing trade negotiations], '. . . They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much.'"); *id.* ¶ 52 (quoting the President's response to a question about the U.S.'s dispute with China over the South China Sea: "I do deals with [China] all the time. [China's largest bank] is a tenant of mine . . . .").

[13] Judge Menashi faults me for citing these statements because they relate to the President's hotel in Washington D.C., and because "no plaintiff in this case owns or is otherwise associated with a hotel in Washington D.C." Menashi Dissent at 29. That is beside the point. The plaintiffs compete with Trump hotels in New York City, *see* Second Am. Compl. ¶¶ 196-97, 228, and with Trump restaurants in both New York City and Washington, D.C., *id.* ¶¶ 182, 191, 196. These statements support the commonsense

explains why representatives of states of the United States will likely be motivated to make choices that will please the President, rather than offend him.

Judges Walker and Menashi dismiss the plaintiffs' theory of injury as too speculative and not "so predictable and certain that we can say, as a matter of economic logic" that plaintiffs will suffer harm. Walker Statement at 3.[14] But neither Judge Menashi nor Judge Walker offer reasons to dispute the seemingly obvious proposition that the opportunity to procure the President's favor or avoid his disfavor is a highly significant motivator for a foreign diplomat or a state representative. It is precisely the significance of that competitive advantage that makes the plaintiffs' theory of injury

---

and logical proposition that the possibility of influencing the President by spending money at his establishments will be a powerful motivation for domestic and foreign government officials to patronize his businesses in preference to those of competitors.

[14] Judge Menashi suggests that the fact that the plaintiffs do not point to a verified instance in which they themselves lost business to a Trump establishment as a result of the challenged conduct means that in all likelihood they have not and will not suffer an injury. Menashi Dissent at 3, 10, 11 n.12. This argument overlooks the fact that the three-year-old complaint we now consider was filed in May 2017, less than five months after Mr. Trump assumed the presidency. In any case, the plaintiffs were under no obligation to include in their complaint evidence that they have *already* suffered injury because Article III clearly confers standing based on a substantial likelihood of *future* injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that the plaintiff's injury must be "actual *or* imminent" (emphasis added) (citation omitted)); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565–66 (2019) (upholding standing based on the plaintiffs' showing that the reinstatement of a citizenship question on the census would cause a likely future injury to the plaintiffs by "depress[ing] the census response rate and lead[ing] to an inaccurate population count"). Moreover, Judge Menashi's argument overlooks Justice Scalia's clarification that "general factual allegations of injury" suffice at the pleading stage. *Lujan*, 504 U.S. at 561.

plausible and supports the conclusion that the plaintiffs are substantially likely to suffer economic injury as a result of the conduct they challenge.

The logic that supports the likelihood that governmental customers will be motivated by the opportunity to attempt to curry the President's favor by spending money at his establishments does not at all depend on the proposition, as Judges Walker and Menashi argue, that *any* advantage realized by a competitor as a result of allegedly illegal conduct is sufficient to establish standing. What is involved in the plaintiffs' allegations is an advantage (derived by the defendant from allegedly illegal conduct) that will be clearly perceptible to governmental customers, and will provide them with a strong incentive to patronize the President's establishments in preference to the plaintiffs'. It is not only eminently plausible but highly likely that foreign diplomats and state representatives will be motivated to spend their money at President Trump's hotels and restaurants precisely because of the hope that doing so will earn favor with him and avoid displeasing him, and that at least some of those officials would have otherwise patronized the plaintiffs' establishments. In a case where the advantage derived by the defendant from illegal conduct was small, and the likelihood was low that potential customers would be aware of it, much less motivated by that advantage to prefer the defendant over a plaintiff, those circumstances would not support a substantial likelihood that the challenged conduct would cause the plaintiff injury, and should not

support a finding of standing. But the present allegations are far removed from that.[15]

---

[15] Judge Walker undertakes to prove the "the absence of the required economic logic in this case" by a hypothetical case, in which the plaintiff, a restaurant, "sues a competing restaurant that used a fraudulently obtained bank loan or tax refund to improve its business, such as by hiring a new chef or lowering prices, thereby increasing its market competitiveness." Walker Statement at 5. Judge Walker's reasoning seems to be that such a case obviously does not involve an injury that is traceable to the defendant's fraud and is therefore not within our Article III jurisdiction.

Judge Walker's hypothetical, however, proves little because it is silent as to the crucial fact of the *significance* of the competing restaurant's unlawfully obtained advantage to its competitive position. If the proceeds from his hypothetical defendant's fraud were small, or enabled only marginal improvements in service or small reductions in prices, the circumstances would not support a substantial likelihood that customers would perceive the differences, much less choose the defendant's restaurant over the plaintiff's because of those differences.

On the other hand, if the proceeds of the defendant's fraud enabled him to offer a restaurant of obviously better quality at substantially similar prices, or a similar restaurant at markedly lower prices, then there would be a far stronger showing of likelihood that the defendant's illegal conduct would cause injury to the plaintiff. Whether there is a substantial likelihood that the defendants' illegal conduct will cause injury to competitors depends on detailed analysis of the facts. In our case, the allegations support a strong inference of likely resultant harm. Judge Walker's hypothetical case does not supply sufficient facts to support such an inference.

What makes his case even more confusing is that Judge Walker's hypothetical complaint would obviously be dismissed *on the merits* because the fraud laws do not afford a remedy to one who is injured in that fashion. The Supreme Court has warned us not to confuse the insufficiency of a complaint on the merits with lack of Article III standing. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253 (2010) ("Subject-matter jurisdiction . . . refers to a tribunal's power to hear a case. It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." (citations and internal quotation marks omitted)).

17

IV.

Judge Walker and Menashi make two more arguments regarding the competitor standing doctrine, which I believe have no force. First, they argue, based on the Supreme Court's decision in *Already*, *LLC v. Nike, Inc.*, 568 U.S. 85 (2013), and this court's decision in *In re United States Catholic Conference*, 885 F.2d 1020 (2d Cir. 1989), that our ruling was premised on an overly permissive standard and failed to reconcile a perceived discrepancy in Second Circuit case law. They rely on *Already* and *Catholic Conference* as showing that a plaintiff does not establish Article III standing by merely "asserting that an advantage to one competitor adversely handicaps the others," and that a court may not assume, merely based on such an assertion, that the plaintiff will suffer harm as a result of her competitor's advantage. Walker Statement at 2. They assert that a plaintiff "must [instead] make that showing" affirmatively. Menashi Dissent at 8.

Our panel decision was not to the contrary. We did not rely on a *mere assertion* of a likelihood that the plaintiffs would suffer harm. To the contrary, as explained at length above, our finding of a substantial likelihood of injury to the plaintiffs was based on analysis of factual allegations that persuasively support that conclusion. *Already* and *Catholic Conference* do not cast any doubt on the logic that supports the likelihood of the plaintiffs' injury in our case. The difference between those cases and this one is that in those cases there was no likelihood that the plaintiffs would suffer injury resulting from the challenged conduct.

18

In *Already*, the petitioner, Already, LLC, which competed with the respondent Nike, Inc. in footwear, sought to invalidate a Nike trademark on which Nike had asserted a claim against Already. 568 U.S. at 88. Nike, however, later abandoned its trademark claim and issued a "Covenant Not to Sue," "promis[ing] that [it] would not raise against Already or any affiliated entity any trademark or unfair competition claim based on any of Already's existing footwear designs, or any future Already designs that constituted a 'colorable imitation' of Already's current products." *Id.* at 88–89. The Supreme Court concluded, on the basis of that covenant, that it was "absolutely clear" that Nike could not be reasonably be expected to again raise a similar trademark challenge. *Id.* at 100. The facts thus showed no likelihood that Already would suffer injury from Nike's challenged trademark.[16]

---

[16] As Judge Walker notes, one of Already's alternative theories of competitive injury was that "so long as Nike remains free to assert its trademark, investors will be apprehensive about investing in Already." 568 U.S. at 96; *see also* Walker Statement at 3. The Supreme Court rejected this theory, explaining that any investor concerns about Nike's assertion of trademark claims against Already were "conjectural or hypothetical" given the existence of the covenant that precluded this possibility, 568 U.S. at 97, apparently using the adjectives "conjectural" and "hypothetical" to mean predictions without factual or logical basis. Here, by contrast, especially as the complaint alleges that the President has openly proclaimed his preference for those who patronize his businesses, government officials' likely choice to patronize the President's establishments over those of the plaintiffs in order to curry his favor would not be based on mere "conjectur[e]."

Another of Already's theories of competitive injury was that, notwithstanding the absence of a reasonable possibility that Nike would assert its trademark against

Similarly, in *Catholic Conference,* our court found no likelihood that the plaintiffs would suffer a competitive injury from the defendant's unlawful conduct because the plaintiffs and the party that enjoyed the allegedly unlawful benefit did not compete. 885 F.2d at 1029–30 (explaining that the "fatal flaw" in plaintiffs' standing argument is that "they are not competitors" with the party enjoying the allegedly unlawful benefit). An advantage to an alleged competitor was not likely to cause a disadvantage to the plaintiffs if, in fact, they are not in competition against each other.

There is a clear strong difference between our case, on the one hand, and *Already* and *Catholic Conference.* Whereas in our case the alleged facts logically support a substantial likelihood that the plaintiffs will be harmed by the defendant's alleged misconduct, in *Already* and *Catholic Conference* the facts showed that there was no such likelihood. Neither case undermines the substantial likelihood, based on the facts asserted in the complaint, that the President's alleged violation of the Emoluments Clauses will cause harm to the plaintiffs.

Second, Judge Menashi argues that the plaintiffs' theory of injury is insufficient as a matter of "economic logic" because the market in which the plaintiffs compete has too few buyers (*i.e.* government patrons) and too

---

Already, Already had standing to challenge that trademark due to its status "as a company engaged in the business of designing and marketing athletic shoes." *Id.* at 98 (alterations omitted). It was in this context that the Court stated that a plaintiff must do more than allege that "a competitor benefits from something allegedly unlawful," and clarified that "[w]e have never accepted such a boundless theory of standing." *Id.* at 99.

many sellers (*i.e.* high-end hotels and restaurants) to permit a court to conclude that the plaintiffs — rather than other hotel and restaurant competitors — are harmed by the President's conduct. In a "single transaction market," he explains, in which one seller obtains an unfair advantage over competitors, it is more reasonable to assume that a different, competing seller suffers an injury as a result of that unfair advantage if the market has 1,000 buyers and only two sellers, than if the market has 1,000 sellers and only one buyer. Menashi Dissent at 11. He posits that the high-end market in which the Trump hotels and restaurants compete with the plaintiffs' might be more like the latter, so that there would be no reason to expect that the inducement to governments to favor Trump establishments causes harm to the plaintiffs. Judge Menashi points to no factual basis to support his proposition. Given the fact that there are nearly 200 nations in the world (and 50 states), many of which send delegates to Washington or New York, where they become buyers whose business the Trump establishments seek, I doubt Judge Menashi's speculation that the ratio of buyers to high-end luxury hotels and restaurants that compete with Trump establishments would look anything like a market of "one buyer and 1000 sellers." *Id.* In any event, this makes no difference because, as explained below in Part V of this statement, our conclusion that the plaintiffs have pleaded likelihood of concrete competitor injury sufficient to satisfy Article III is in conformity with conventional daily decisions of federal courts to entertain suits alleging

antitrust violations, false advertising, false designations of origin, and unfair competition.[17]

## V.

In assailing the panel opinion's analysis of the plaintiff's theory of competitive injury, Judge Menashi asserts that the Supreme Court has held that, to meet the requirements of Article III, an imminent injury must be "certainly impending" — or, alternatively, that the challenged conduct must "almost surely" have caused the plaintiffs harm. Menashi Dissent at 4. He cites to the Supreme Court's opinion in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), in which the Court stated that a plaintiff can establish Article III standing based on an imminent injury by showing that her threatened injury is "certainly impending" rather than merely "possible." *Id.* at 409. The *Clapper* opinion, however, acknowledged that "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is *literally certain* that the harms they identify will come about," and that a

---

[17] Judge Menashi complains that I gratuitously and incorrectly attribute to him a view that "the market for high-end restaurants and hotels is one with many sellers and few buyers," when in fact, he asserts, his only point was to note the majority's lack of interest in the question. Menashi Dissent at 11 & n.12. If I have misread his argument, I apologize. But, especially as this passage of his dissent calls the majority's conclusion "indefensible" and impermissibl[e], *id.*, I read it as suggesting that a proper exploration of the buyer-seller ratio would have shown the majority that its conclusion was erroneous. I do not interpret his vote for *en banc* rehearing as expressing a wish for a new opinion supporting the same conclusion with better reasons.

"substantial risk" of harm will suffice. *Id.* at 414 n.5.[18] Indeed, the Supreme

Court has often expressed the governing standard without any reference to

"certainty," but requiring only a "realistic danger" or a "substantial risk" of

harm. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298

(1979) ("A plaintiff who challenges a statute must demonstrate a *realistic*

*danger* of sustaining a direct injury as a result of the statute's operation or

enforcement." (emphasis added)).[19] One year after *Clapper*, Justice Thomas,

writing for a unanimous Court, asserted that an allegation of imminent

injury qualifies as an Article III injury-in-fact *either* "if the threatened injury

is 'certainly impending'" *or* if "there is a 'substantial risk' that the harm will

occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing

*Clapper*, 568 U.S. at 414 n.5). Still more recently, the Supreme Court has

---

[18] Judge Menashi further points out that, in *Clapper*, the Supreme Court stated that a plaintiff "cannot rely on speculation about 'the unfettered choices made by independent actors not before the court'" to establish standing. 568 U.S. at 414 n.5 (citation omitted); Menashi Dissent at 34. However, as explained in the majority opinion, "[t]hat Plaintiffs' theory of harm results from decisions of third parties does not preclude finding the cognizable link between the challenged action and the alleged harm that Article III requires." 953 F.3d at 197–98; *see also Dep't of Commerce,* 139 S. Ct. at 2566 (holding that plaintiffs had Article III standing where their "theory of standing . . . relies [] on the predictable effect of [the challenged action] on the decisions of third parties"); *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) ("It is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons.").

[19] As Justice Breyer's dissenting opinion explained in *Clapper*, "*certainty* is not, and has never been, the touchstone of standing," and "federal courts frequently entertain actions for injunctions and for declaratory relief aimed at preventing [harm] that [is] reasonably likely or highly likely, but not absolutely certain, to take place." 568 U.S. at 431 (Breyer, J., dissenting).

explained that a "risk of real harm" can satisfy the injury-in-fact requirement of Article III. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).[20] And in *Department of Commerce v. New York,* the Court upheld Article III standing based on a "sufficient likelihood" of "future injur[y]." 139 S. Ct. 2551, 2565 (2019). These holdings make clear that certainty of impending injury is not necessary to establish Article III jurisdiction.[21]

Moreover, if "certainly impending" injury were necessary, hardly ever would a competitor's suit for antitrust violation, trademark infringement, false designation of origin, false advertising, or unfair competition be heard in federal court.[22] In most such cases, there is no less likelihood than here that customers would patronize the alleged offender regardless of the offending conduct because of better service or quality,

---

[20] The *Spokeo* opinion added, "[T]he law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure." 136 S. Ct. at 1549.

[21] *Cf. Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018) ("[Plaintiffs] need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test [for Article III purposes]." (quoting *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C. Cir. 1990))).

[22] In *POM Wonderful LLC v. Coca-Cola Co.*, for example, the Supreme Court allowed a false advertising claim to proceed based on defendant's allegedly deceptive use of the words "pomegranate blueberry" on its juice packaging. 573 U.S. 102, 110 (2014). The plaintiff's theory of harm was that customers would likely buy the defendant's product in preference to plaintiff's in the mistaken belief that the defendant's juice, like the plaintiff's, contained predominantly pomegranate juice. *Id*. There were no doubt innumerable reasons why some customers might have favored the defendant's product regardless of the defendant's allegedly false claims. The Supreme Court nonetheless upheld the sufficiency of pleading without questioning the plaintiff's Article III standing.

lower prices, dependence on the defendant's goodwill, or other motivations. Making a related argument, Judges Walker and Menashi suggest that standing is necessarily defeated by the possibility that government patrons might choose Trump establishments for a variety of reasons *other than* their desire to curry favor with the President, such as "service, quality, location, price and other factors related to individual preference." *See* Walker Statement at 4; Menashi Dissent at 10. It is of course true that some government customers might choose Trump hotels and restaurants for other reasons. That is true in virtually all cases of competitor standing. If it were clear that customers would choose the defendant over the plaintiff regardless of the defendant's allegedly illegal activity — *i.e.* that the challenged conduct *could not affect* customer decision-making — then there would be no likelihood that the defendant's illegal conduct would cause the plaintiffs injury, and the plaintiffs would have no Article III standing. Such a claim would fail for the same sorts of reasons as defeated Already's claim in the Supreme Court. *Already*, 568 U.S. at 100.  But the mere possibility of that circumstance does not affect the plaintiff's Article III standing so long as the facts show a substantial likelihood that the defendant's conduct will cause the plaintiff injury.

Where a plaintiff brings a trademark infringement claim, for example, alleging that a competitor is using the plaintiff's trademark on similar goods, the federal courts exercise jurisdiction without need for allegation or proof, to a certainty, that the plaintiff has lost or will lose

business or suffer harm as a result. A substantial likelihood that the defendant's conduct will inflict harm is sufficient, and a mere possibility that some customers may choose the defendant's product over the plaintiff's for reasons unrelated to the challenged conduct does not defeat standing.[23] Indeed, the federal trademark statute expressly authorizes a claim where the defendant's conduct is "*likely to* cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a)–(b) (emphasis added). Were the federal courts to adopt the "certainty" standard as necessary to establish Article III jurisdiction, or reject all cases in which the possibility exists that customers might choose the defendant over the plaintiff for reasons other than the defendant's unlawful conduct, antitrust, trademark, false advertising, and unfair competition litigation would virtually disappear from the federal court dockets.

Judge Menashi dismisses as irrelevant the fact that the injury alleged by these plaintiffs would satisfy Article III in antitrust, trademark, false designation of origin, false advertising, and unfair competition cases. *See* Menashi Dissent at 34–35. He quotes from *Spokeo*, 136 S. Ct. at 1549, "Congress has the power to define injuries . . . that will give rise to a case or controversy where none existed before," and argues that our jurisdiction

---

[23] *See Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190–91 (2d Cir. 1980) (holding that because the parties were "competitors in a relevant market," and because the plaintiff had shown a "logical causal connection between the alleged false advertising and its own sales position," the plaintiff had established statutory standing under the Lanham Act).

over those federal claims depends on the fact that Congress has passed a statute creating a cause of action, which elevated the injury resulting from its violation into one that can satisfy Article III. *Id.* at 35. Accordingly, he argues, injuries in such cases satisfy Article III only because they are "defined by statute," *id.*, and those precedents therefore "provide no support" for the exercise of jurisdiction in this case because the plaintiffs here "cannot identify any 'statutes creating legal rights, the invasion of which creates standing.'" *Id.* (quoting *Lujan*, 504 U.S. at 578). He further contends that the Emoluments Clauses do not provide these plaintiffs a "right to be free from the competition they allege causes them harm," and that, because the plaintiffs cannot point to any "statutory or other legal right[s] the violation of which might serve as an injury to them," their interest in the President's compliance with the Emoluments Clauses is a mere "generalized grievance" that must be viewed as on the same inadequate footing as a citizen suit seeking to vindicate the right to "have the Government act in accordance with law." *Id.* at 35 (quoting *Lujan*, 504 U.S. at 575).

The flaws in this reasoning seem to be numerous. To begin, Judge Menashi is mistaken that our ability under Article III to exercise jurisdiction over lawsuits alleging violations of federal unfair competition laws (*i.e.* antitrust, trademark, and false advertising cases) depends on Congress having exercised its ability to "define injuries and articulate chains of causation that will give rise to a case or controversy where none

27

existed before." *Id.* at 35 (quoting *Spokeo*, 136 S. Ct. at 1549). While it is undoubtedly true, as stated in *Spokeo*, that "Congress may elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," 136 S. Ct. at 1549 (alteration in original) (quoting *Lujan*, 504 U.S. at 578), there is neither a logical nor legal basis for Judge Menashi's apparent corollary that injury to a plaintiff's business interests inflicted by a competitor's conduct can satisfy the adversity requirement of Article III only if the claim is statutory.[24] Federal courts exercise jurisdiction over similar state law claims, *common law* as well as statutory, on the basis of precisely the same form and degree of likelihood of competitive injury — that is, the loss of business resulting from the conduct of a competitor.[25] Our adjudication of these state common law

---

[24] Particularly because competitive economic injuries, like the injuries alleged here, "have long been recognized as sufficient to lay the basis for standing." *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972).

[25] *See, e.g., Lemberg Law, LLC v. eGeneration Marketing, Inc.*, No. 3:18-cv-570, 2020 WL 2813177, at *4 (D. Conn. Mar. 29, 2020) (exercising jurisdiction over a state law deceptive practices claim brought by a law firm alleging that the defendant "deceive[d] . . . Plaintiff's customers and potential customers[] into believing that Defendants are lawyers" (internal quotation marks omitted)); *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 449 (S.D.N.Y. 2012) (Sullivan, J.) (holding that a plaintiff has Article III standing — but not statutory standing — to bring state law false advertising claims because "a manufacturer . . . is injured [for Article III purposes] when a competitor falsely advertises that its chemically distinct product is identical to the manufacturer's product"). Federal courts also exercise jurisdiction over claims asserting novel forms of injury — *e.g.*, hot news misappropriation — without regard for whether such injuries have been recognized by statute. *See Int'l News Serv. v. Associated Press*, 248 U.S. 215, 231–32 (1918) (adjudicating a common law claim for misappropriation of breaking news

claims is incompatible with Judge Menashi's proposition that our jurisdiction over similar federal claims depends on a statutory enactment. *See* Menashi Dissent at 34–35. To the contrary, it tends to confirm that likelihood of competitive injury can satisfy the adversity requirement of Article III, regardless of whether the plaintiff's claim arises under a federal statute, a state statute, state common law, or the Constitution.

As for Judge Menashi's contention that an injury that satisfies Article III if it results from violation of a right explicitly stated in a federal statute will not necessarily satisfy Article III if it results from violation of a right allegedly implied in the Constitution, Justice Scalia forcefully stated in *Lujan*, "there is absolutely no basis for making the Article III injury turn on the source of the asserted right." 504 U.S. at 576. Whether a claim of competitive injury satisfies the adversity requirements of Article III turns on the substantiality and degree of likelihood of injury, and not on whether the injury resulted from a violation of federal, as opposed to state, law, or whether the asserted right is expressly stated or implied in the legislative writing.

Judge Menashi further argues that "the Emoluments Clauses do not give plaintiffs a right to be free from the competition they allege causes them harm," Menashi Dissent at 36, and that, without a "legal right the

---

articles brought by The Associated Press against a competing news provider); *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 457 (S.D.N.Y. 2009) (exercising jurisdiction over a similar state law "hot news" misappropriation claim).

violation of which may serve as an injury to them," *id*. at 35, they cannot satisfy the requirements of Article III. This argument depends on reasoning that has been expressly repudiated by the Supreme Court. While in the 1930s the Supreme Court dismissed several cases for lack of standing on the grounds that a plaintiff whose injury was the result of "lawful competition" has not suffered violation of a "legal interest" or a "legal right," *Ala. Power Co. v. Ickes*, 302 U.S. 464, 479–83 (1938) (dismissing case brought by power company alleging that federal officials harmed its business by unlawfully supplying loans and grants to its competitors); *see also Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 140 (1939), the Court decisively repudiated that approach 30 years later, clarifying that "the existence or non-existence of a 'legal interest' is a matter quite distinct from the problem of standing" and instead "goes to the merits," *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 & n.1 (1970); *see also id*. at 152 (holding that "[t]here can be no doubt" that the plaintiffs have Article III standing because they "allege that competition [resulting from the challenged regulation] might entail some future loss of profits for [them]"). Indeed, the Supreme Court, speaking through Justice Scalia, has made clear that whether a complaint states an actionable claim, and whether the court has jurisdiction to adjudicate the claim, are wholly separate questions. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014) (explaining that "whether [the plaintiff] has a cause of action" is separate from whether the complaint "presents a case or

controversy that is properly within federal courts' Article III jurisdiction"). "[I]t is well settled," the Court stated in *Bell v. Hood*, "that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." 327 U.S. 678, 682 (1946); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal." (internal quotation marks and citation omitted)); *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (criticizing the Court of Appeals for "confus[ing] the question of whether petitioner had standing with the question of whether she had asserted a proper cause of action").

Finally, Judge Menashi notes that "the mere alleged violation of the Emoluments Clauses cannot itself serve as an Article III injury," and that the Clauses do not "confer on the plaintiffs a particularized interest the violation of which might create standing *in the absence of an otherwise cognizable concrete injury*." Menashi Dissent at 36 (emphasis added). I completely agree that a violation of the Emoluments Clauses does not, by itself, confer standing, and agree as well that a mere "generalized grievance" is insufficient. But Judge Menashi goes on to assert that these plaintiffs' only interest "in the President's compliance with the Emoluments Clauses" is "common to all members of the public." *Id.* at 36 (quoting *Lujan*, 504 U.S. at 575). This argument sweeps under the rug the plaintiffs' entirely plausible allegation that, as a result of the President's

conduct, their businesses will suffer a direct and particularized economic injury: specifically, a diminution of business revenues. As the Supreme Court explained in *Sierra Club v. Morton*, harm to a plaintiff's "competitive position" in the marketplace is precisely the type of "palpable economic injur[y]" that "ha[s] long been recognized as sufficient to lay the basis for standing, with or without a specific statutory provision [permitting suit]." 405 U.S. at 733–34. It is the plaintiffs' "palpable economic injury" — not an "impermissible generalized grievance," Menashi Dissent at 36, — that supports exercise of jurisdiction here.

VI.

Judge Menashi asserts that the standards adopted in the panel opinion and in this statement would have the consequence of "convert[ing] the Judiciary into an open forum for the resolution of political or ideological disputes." Menashi Dissent at 21.[26] He suggests no reason why

---

[26] Judge Menashi's formulation is quoted from Justice Powell's concurring opinion in *United States v. Richardson*, 418 U.S. 166, 192 (1974). That case was nothing like this one. In *Richardson*, a taxpayer sought a judicial declaration that the CIA violated the Constitution by failing to disclose certain expenditures. *Id.* at 167–70. The Supreme Court held that the taxpayer lacked a "personal stake in the outcome" of his lawsuit. *Id.* at 179–80. Justice Powell concurred, arguing that the Court should have gone further and disavowed a more permissive approach to standing that the Court had adopted in prior precedents. *Id.* at 180 (Powell, J., concurring). Justice Powell noted his agreement with other precedents in which the Court had rejected "taxpayer or citizen standing where the plaintiff has nothing at stake other than his interest as a taxpayer or a citizen" as a result of its "antipathy to efforts to convert the Judiciary into an open forum for the

that should be the case, and I can see none. The panel opinion and my Statement simply apply well established Supreme Court precedent to the facts alleged in the complaint. The same precedents and logic support Article III standing in numerous other cases concerning commercial disputes between private competitors. That the President is the defendant in this suit is not a reason to depart from these well-established principles of jurisdiction, nor does it justify the contention that the panel's faithful application of those principles in support of its finding of subject matter jurisdiction would alter or expand the role of the judiciary or have any political or ideological consequences.

---

resolution of political or ideological disputes about the performance of government." *Id.* at 192. Justice Powell's words simply expressed the well-accepted principle that a "generalized grievance . . . common to all members of the public" is insufficient to establish standing. *Id*. at 176–77. They have no conceivable bearing on a suit by operators of hotels and restaurants claiming that they are suffering and will suffer losses of business because of allegedly illegal conduct of a competitor.